**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MOHAMED ELHASSAN MOHAMED** AS NEXT FRIEND FOR **AHMED MOHAMED, A MINOR** | § § § § | |
| **Plaintiff** | § § | **Civil Action No.** |
| **VS.** | § § | _____ |
| **IRVING INDEPENDENT SCHOOL DISTRICT; DANIEL CUMMINGS, IN HIS INDIVIDUAL CAPACITY; AND CITY OF IRVING,** | § § § § § | |
| **Defendants.** | § § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

TO THE HONORABLE JUDGE OF SAID COURT:

Mohamed Elhassan Mohamed as next friend of his son, Ahmed Mohamed, claims that Defendants violated Ahmed's rights under the United States Constitution and the laws of the United States.

### JURISDICTION AND VENUE

1.      Plaintiff brings this action under the U.S. Constitution, 42 U.S.C. §1983 and 42 U.S.C. § 2000d et seq. Jurisdiction is based on 28 U.S.C. §§1331, 1343(a)(3)-(4).

2.      Venue is proper in this Court under 28 U.S.C. §1391(b)(1)-(2) as the county in which all or part of the cause of action arose.

## PARTIES

3.      Mohamed Elhassan Mohamed is the father of Ahmed Mohamed and they are both United States citizens.

4.      Irving Independent School District is a municipality of the State of Texas.  It may be served by serving its Superintendent, Jose Parra, at 2621 W. Airport Freeway, Irving, Texas 75062

5.      Daniel Cummings is the principal of MacArthur High School and may be served at 3700 N. Mac Arthur, Irving, Texas 75062

6.      City of Irving is a municipality of the State of Texas.  It may be served through its Mayor, Beth Van Duyne, and/or the City Secretary, at 825 W. Irving Blvd., Irving, Texas 75060.

## STATEMENT OF FACTS

7.      Every claim deserves context.  Ahmed Mohamed's claims under Title VI and 42 U.S.C. § 1983 and the United States Constitution can only be understood in the context of the discrimination in America that those provisions were designed to address.

I.      IMMIGRATION IN AMERICA

> Not like the brazen giant of Greek fame,
> With conquering limbs astride from land to land;
> Here at our sea-washed, sunset gates shall stand
> A mighty woman with a torch, whose flame
> Is the imprisoned lightning, and her name
> Mother of Exiles.  From her beacon-hand
> Glows world-wide welcome; her mild eyes command
> The air-bridged harbor that twin cities frame.
> "Keep ancient lands, your storied pomp!' cries she
> With silent lips.  "Give me your tired, your poor,
> Your huddled masses yearning to breathe free,
> The wretched refuse of your teeming shore.
> Send these, the homeless, tempest-tost to me,
> I lift my lamp beside the golden door!

8.      The United States is a nation of immigrants.  Unless you're a Native American, you come from immigrants.  Despite that fact, we have a long and storied history of discrimination by

groups against other groups.  In some of the earliest records, the English passed laws to prevent the coming of the Quakers and the spread of their "accursed tenets." In 1619, the first African slaves arrived on a Dutch warship from the West Indies, beginning centuries of slave trade.   In the 1700's, Massachusetts was wary of Catholics, Jesuits and "lame, impotent or infirm persons" and passed laws limiting immigration.  The 1790 Naturalization Act excluded from citizenship not only non-white immigrants but also a group of people already here—Indians.  As "domestic foreigners," Native Americans could not seek naturalized citizenship because they were not "white."   In the century after 1820, five million Irish immigrants came to the United States. They were denounced for their origin and their Catholic religion.   In 1849, some citizens organized into an anti-Catholic, anti-immigrant political group called the "Know-Nothings" (derived from the secrecy of its members).   They campaigned against the Germans and the Catholics as poor and backward. The 1880's saw a huge immigration explosion.  The period between 1880 and 1924 witnessed an average of 560,000 immigrants per year.  There was a large increase in Jewish immigration to the U.S. due to repressive laws enacted in Russia and Prussia. Additionally, large numbers of Italians fleeing the economic and political climate of their homeland came to America.  The Chinese Exclusion Act of 1882 suspended the admission of Chinese laborers for ten years.   The Expatriation Act of 1907 declared that any woman who "married a foreigner" gave up her United States citizenship.  Also in 1907, Roosevelt and the Government of Japan reached an agreement stopping issuance of passports to Japanese laborers. The Immigration Act of 1917 denied entry to immigrants from the "Asiatic Barred Zone" (much of eastern Asia and the Pacific islands).  On February 19, 1942, President Roosevelt authorized the internment of tens of thousands of American citizens of Japanese ancestry.  The same order also applied to smaller number of residents who were of Italian or German descent. In November

2005, The Secure Border Initiative was enacted to "secure America's borders and reduce illegal migration" from Mexico.  It seems like the U.S. is free to target certain groups so long as it is the popular target of the time.  Currently, the popular target is African American Muslims.

## II.    RACISM AND THE IRVING INDEPENDENT SCHOOL DISTRICT (IISD)

9.      The IISD has a long and ugly history of race struggles up to and including the Board of Trustees.  Additionally, the State of Texas, including the IISD, has a history of discrimination against Muslims in Texas curriculum and schools.

10.     The Texas State Board of Education in 2010 adopted a statewide social studies and history curriculum that amended or watered down the teaching of the civil rights movement, religious freedoms, America's relationship with the United Nations and hundreds of other topics. The Board also adopted a resolution in 2010 that sought to limit references to Islam in Texas textbooks, claiming that the materials were "tainted" with "pro-Islamic, anti-Christian distortions."

11.     A report out in 2011 found that Texas K-12 standards in history are inadequate, ineffective and "fail to meet the state's college readiness standards." The report notes that the Fordham Institute gave Texas's history standards a "D" grade, calling them a "politicized distortion of history" that is "both unwieldy and troubling" while "offering misrepresentations at every turn."

12.     The strength of anti-Muslim sentiment is aptly demonstrated by a message left recently on the voice mail of an Irving Muslim civil rights organization:

> F*** you, f*** Mohamed, f*** Islam.  This is America.  If you don't like the way we do s***, get the f*** out.  Because let me tell you something, people like me and my other military brothers are f***** armed to the teeth and we will meet you on any battleground that you want.  So you better tell all your Islamic f****** fa**** c********* people that they better stay in their own f***** realm, stay in their own lane. If you're here in America, you serve our laws.  We don't serve Sharia law here.

And if you want, we'll start cutting off the heads of all you m*****f******. How would you like that? Maybe we need another Christian crusade, which I think we do. And I'm a Christian. I'm gonna tell you, I'm your f****** enemy. I hate you and I will never be your f****** friend. We will cut all of your heads off, you understand me? All of them.

The message demonstrates not only the level of anti-Muslim sentiment but a vast ignorance of the Muslim religion.

13.     Not only does Texas, and specifically the Irving Independent School District, get a "D" for anti-Muslim sentiment and politicizing history, it gets an "F" for continuing a long tradition of racial disparity in student discipline. The Texas Education Agency tracks the statistics reflecting student discipline and race. Those statistics are available on its website.

14.     The Irving Independent School District consists of 3 early childhood schools, 20 elementary schools, 8 middle schools (grades 6-8) and 5 high schools (grades 9-12). It is governed by a seven-member Board of Trustees who are elected to serve a three year term through general elections held in May.

15.     In the 2007/2008 data for IISD, there were 2,469 ISS (in school suspension) actions for 4,677 African American students (a rate of 52% based upon incidents) and 1,719 ISS actions for 5,731 white students (a rate of 29% based upon incidents). There were 873 OSS (out of school suspension) actions for African American students (a rate of 18% based upon incidents) and 570 OSS actions for white students (a rate of 9% based upon incidents). If you were a black student in the IISD during this school year, your chances of receiving a disciplinary suspension were nearly doubled.

16.     In the 2008/2009 data for IISD, there were 2,764 ISS (in school suspension) actions for 4,891 African American students (a rate of 56% based upon incidents) and 1,468 ISS actions for 5,299 white students (a rate of 27% based upon incidents). There were 822 OSS (out of school suspension) actions for African American students (a rate of 16% based upon incidents) and 406

OSS actions for white students (a rate of 7% based upon incidents). Again, despite being on notice of the issue, IISD suspended black students at nearly double the rate of white students.

17.     In the 2009/2010 data for IISD, there were 2,460 ISS (in school suspension) actions for 5064 African American students (a rate of 48% based upon incidents) and 1,628 ISS actions for 5,058 white students (a rate of 32% based upon incidents).  There were 636 OSS (out of school suspension) actions for African American students (a rate of 12% based upon incidents) and 413 OSS actions for white students (a rate of 8% based upon incidents). The gap is not as large, but it remains significant.

18.     In the 2010/2011 data for IISD, there were 2,045 ISS (in school suspension) actions for 4771 African American students (a rate of 42% based upon incidents) and 1,069 ISS actions for 4362 white students (a rate of 24% based upon incidents).  There were 624 OSS (out of school suspension) actions for African American students (a rate of 13% based upon incidents) and 314 OSS actions for white students (a rate of 7% based upon incidents). Again, the gap remains significant.

19.     In the 2011/2012 data for IISD, there were 2,051 ISS (in school suspension) actions for 5037 African American students (a rate of 40% based upon incidents) and 1,094 ISS actions for 4112 white students (a rate of 26% based upon incidents).  There were 695 OSS (out of school suspension) actions for African American students (a rate of 13% based upon incidents) and 383 OSS actions for white students (a rate of 9% based upon incidents). Still, the gap remains significant.

20.     In the 2012/2013 data for IISD, there were 2,136 ISS (in school suspension) actions for 5162 African American students (a rate of 41% based upon incidents) and 802 ISS actions for 3946 white students (a rate of 20% based upon incidents).  There were 756 OSS (out of school

suspension) actions for African American students (a rate of 14% based upon incidents) and 306

OSS actions for white students (a rate of 7% based upon incidents).   The gap widens again.

21.     In the 2013/2014 data for IISD, there were 2374 ISS (in school suspension) actions for

5195 African American students (a rate of 45% based upon incidents) and 935 ISS actions for

3758 white students (a rate of 24% based upon incidents).   There were 897 OSS (out of school

suspension) actions for African American students (a rate of 17% based upon incidents) and 412

OSS actions for white students (a rate of 10% based upon incidents). There is no explanation

why the district has taken no steps to address the continuing disparity between discipline for

white children versus discipline for black/African American children.

22.     In the 2014/2015 data for IISD, there were 1329 ISS (in school suspension) actions for

5254 African American students (a rate of 25% based upon incidents) and 512 ISS actions for

3594 white students (a rate of 14% based upon incidents).   There were 632 OSS (out of school

suspension) actions for African American students (a rate of 12% based upon incidents) and 245

OSS actions for white students (a rate of 6% based upon incidents).   The rates of discipline

remain approximately double even after years of knowledge of the disparity by the IISD.   The

district has done nothing meaningful to address the disparity or correct the inequality.

23.     In 2008, members of the Irving Education Coalition entered into a dialog with the IISD

Superintendent relating to a number of issues related to discrimination in the IISD.   Those issues

included discrimination in the application of student discipline as observed by parents and

teachers as well as reflected in TEA statistics, lack of minority teachers and administrators, and a

lack of cultural appreciation for all student groups in the district.   The coalition entered into a

Memorandum of Understanding with the district wherein it was agreed, among other things, that

the district would have the discipline data analyzed and allegations of discrimination based on race evaluated.

24.     In 2009, after determining that IISD had a "disproportionate number of African American students being sent to disciplinary and alternative education compared to other ethnic groups," the district hired Dr. Mack Hines to provide professional development expertise to teachers on how to develop desired positive behavioral responses from African American students in the classroom.  Dr. Hines conducted a study and created a report titled "The Skin They're In."

25.     Dr. Hines' report explained the "need to evaluate the school-related experiences and beliefs of the African-American elementary school child" in the IISD.  His study investigated 124 African-American fifth grade students' experiences in 20 elementary schools in the IISD. He collected and analyzed both statistical data and anecdotal information from the students.  His findings relative to the elementary school experience for these children included that they felt "isolated," were the targets of ongoing racial slurs, and felt "alienated by teachers."  There was a substantial amount of anecdotal evidence from these children ("I just want to be something else other than black at that moment," is but one heartbreaking example).

26.     Hines' study found that the most frequently cited area of racial disparity was school discipline practices.   They were reprimanded differently and received suspensions more frequently.    Over and over again, students reported examples of different treatment that they perceived was race based.

27.     The study by Dr. Hines also examined what he termed "access to equality-based structures," defined as rights that should be afforded to all students, ranging from dress code to using the restroom.  The African-American students reported serious differences in treatment in these areas as well.   On one campus, several students reported that non-African-American

students were allowed to use the restroom any time of the day but most African-American students had specific times of the day that they could ask to use the restroom.   That is but one example of the many that were given but it demonstrates the extent of the differences in treatment.

28.     Dr. Hines concluded that the findings from his study pointed to "dysconcsious racism," knowingly or unknowingly discriminating against people because of race.   He stated that the underlying premise for this type of racism is the acceptance of dominant white norms and privilege.   He explained that dysconcious racism is based on treating people differently if they do not assimilate norms that have been controlled or sanctioned by white culture.   Dr. Hines concluded with a long list of recommendations on how to address the problem of racism in the IISD.

29.     In 2011, Dr. Steven Jones, a white male, campaigned for election to the IISD Board of Trustees.   He ran against incumbent Nancy Jones, an African American.   At the time, the Superintendent was Dr. Dana Bedden, a black male.   During his campaign, Dr. Jones called the IISD "black town" and stated that "a vote for me is a vote against a black controlled school district."   Dr. Jones was very open about his plan to have his white cronies elected to other trustee positions and take over the Board.   Dr. Jones was elected and he immediately filed two unsubstantiated complaints against Dr. Bedden, blatantly declaring his intent to get Bedden fired.

30.     In September 2011, the Board of Trustees met with Dr. Hines concerning his "The Skin They're In" report.   The Board reacted to the negative manner in which the report was received (particularly where it concluded there was an IISD "race war" between Hispanics and African-Americans) by determining that Dr. Hines went beyond the scope of what he was hired to do, did

not use proper methodologies and they declined to implement his recommendations to address the problem.

31.     In October 2012, a woman named Ginger Russell sent out a chain email with the subject "Irving ISD Indoctrinating Islam" to school board members and district officials.  The email warned that "Christians are going to have to stand up against the pro-Islamic teaching in our public schools with CSCOPE curriculum."  She also posted a letter to a Tea Party website saying that CSCOPE had "Marxist" views.  The Board got in touch with officials who reassured them the curriculum met state guidelines and the email was wrong.  However, Trustee Jones insisted on more.  They hired a "very socially and fiscally conservative" former teacher to "seek out" any Islamic bias in CSCOPE.  The investigation resulted in a 72 page handout listing every religious reference in the CSCOPE curriculum.  The results indicated that Christianity got twice as much attention in the curriculum as any other religion and if there was any bias in CSCOPE, it was "bias against radical Islam."

32.     In April 2013, there were numerous and ongoing allegations by many people that Dr. Jones was violating district policies, Board procedures and state and federal laws by his actions in undermining the Superintendent, usurping others' duties and stepping out of the bounds of his authority.     IISD hired an investigator to determine whether Dr. Jones had violated law or policies in his attempts to micromanage the affairs of the district.  The investigator found all of the claims against Jones substantiated.  One of the employees that Jones threatened to fire was one he referred to as a "cancer in the district" because that person had brought in a speaker to address the over-representation of African Americans in alternative education.  Dr. Jones was found to have threatened district employees to have them fired if they supported Dr. Bedden.  He was found to have stated that as soon as he had four votes on the Board, he would terminate Dr.

Bedden and get "like-minded" people on board.  He told numerous people that "Spanish accents had to go" and it needed to be "English only" in the schools.  He complained about there being Spanish posters in the schools and stated "we're here in the United States and this is in Spanish." He directed the administrative staff to forbid the use of Spanish.

33.     The independent investigator's findings included that Jones violated numerous policies of the IISD as well as the law.  She stated that "[r]ights of free speech or expression, as guaranteed under the First Amendment of the U.S. Constitution and Section 8 of the Texas Constitution's Bill of Rights are contained in Section 37.123 of the Texas Education Code.  Dr. Jones' forbidding persons in IISD from speaking Spanish was a violation of free speech/expression as provided for in the state and U.S. constitutions, as well as the Texas Education Code."

34.     After Jones was censured by the Board, there were new elections and Jones was able to get his people in and a majority on the Board.  He had his "like-minded people."

35.     In March 2015, the Irving City Council voted to back a law stating that foreign laws do not apply in U.S. courts.  The law was created in response to a local Islamic tribunal that mediated in civil cases on a voluntary basis for member of the Muslim community.  That action created tension between the white community and the Muslim community.   There remained a disparity between the racial makeup of the community and that of the school administration.

III.     The Irving Police Department's History of Wrongful Arrests

36.     The C.A.P. Effect.  Run by the Department of Homeland Security, the CAP (Criminal Alien Program) was meant to give local law enforcement officials access to Immigration and Customs Enforcement (ICE) information and personnel to facilitate the identification of serious, dangerous criminals and deport them.  The program was instituted in Irving in 2006.  A report by the University of California, Berkeley School of Law proved that CAP leads to rampant profiling

and wrongful arrests.   The report found that during the Irving police force's participation in CAP, there was a 150 percent increase in arrests for petty crimes, including minor misdemeanors and traffic offenses.   Congress made clear that ICE "should have no greater immigration enforcement priority than to remove deportable aliens with serious criminal histories from the Unites States."   But the results of Irving's aggressive arrest policies didn't target serious criminals.   Once CAP was implemented in Irving, felony charges only accounted for 2 percent of the ICE detainees, while 98 percent of detainees were charged with misdemeanor offenses.   As a result, Irving police officers engaged in a pattern of unconstitutional arrests.

IV.   AHMED MOHAMED AND HIS FAMILY

37.   Ahmed Mohamed is a fourteen-year-old boy.   He is an African American Muslim and a citizen of the United States.   He has a mother, a father, four sisters and a brother.   His father is Mohamed Elhassan Mohamed, an immigrant from Sudan who is also a United States citizen.

38.   Mohamed earned a bachelor's degree in Philosophy while still in Sudan.   He also became a clergyman.   He is a Sufi Muslim who supported Mahmoud Mohammed Taha, a Sudanese religious leader and engineer who postulated that the verses of the Qur'an revealed in Mecca represented the ideal religion, which would be revived when humanity reached the stage of development capable of accepting this concept.   This would usher in a new understanding of Islam based on freedom and equality for all.   Because of his unorthodox beliefs about reforming Islam, Taha was arrested by the military dictator Gaafar Nimeiry.   He was put on trial, but despite other world leaders attempting to intervene on his behalf, including then Vice President George H.W. Bush, Taha was hanged.   As one of Taha's vocal supporters, Mohamed fled to the United States to avoid religious persecution.

39.    After Nimeiry was overthrown, Mohamed traveled back and forth between the United States and Sudan and settled with his family in Irving, Texas where Mohamed became the President of the Alsufi Center.   Ahmed was the third of six children.   When he was five, the family went back to Sudan for three years during Ahmed's first and second grades in elementary school.   The kids all became very homesick for the U.S.A. and the family moved back to Irving where Ahmed began third grade at Townsell Elementary.   Ahmed graduated from Townsell Elementary, as did three of his sisters and his little brother.

40.    When Ahmed started the third grade, he knew no English.   The school provided him "reading buddies" from the Irving Bible Church.   These volunteers would come and read with Ahmed to help improve his language skills.   Because of his language barriers, Ahmed was an "outsider" at school and the friendship of his reading buddies was important to him.   They remain his friends to this day.

41.    Ahmed found his love of all things electronic/robotic at an early age.   His father, Mohamed, was a business entrepreneur, and included among his businesses was a cell phone/pager company that, at one point, grew to eight stores in the Metroplex.   When various of those stores closed down, much of the remaining parts and inventory ended up in the family's garage and a shed, which became Ahmed's playground.   He would rummage through the treasures there and take things up to his desk in his room where he would make elaborate creations to take to school and show his teachers.

42.    Ahmed began sixth grade at Sam Houston Middle School also as an "outsider," still struggling with English and eager to impress his teachers.   As an African American Muslim, Ahmed was the target of bullying.   Kids called him Sausage Boy and Bacon Boy because he did not eat pork.   They made fun of him for his religion.   Ahmed also made friends and, as is typical

of a middle school boy, engaged in a lot of horseplay.  One teacher remembers that he and a group of friends would line up on opposite sides of a field, run into each other and then line up and do it again, over and over.  They also used to play physical games, such as "the neck game," where one kid says to another "look!" and if you look, you get slapped in the neck.

43.     In middle school, it was common-place for Ahmed to bring home-made gadgets to school in his backpack.  He was a member of the robotics club, and he also liked to show off his creations to his teachers.  He took home-made elaborate contraptions to school on a regular basis.  One of his teachers, Mr. Ralph Kubiak, said that he loved Ahmed and Ahmed's intelligence, as well as his enthusiasm for elaborate gizmos, some of which looked much like the now infamous clock—a mess of wires and circuits.  Even after Ahmed completed Mr. Kubiak's class, they would still talk in the halls on a daily basis, discussing politics and religion.  Kubiak and Ahmed even discussed the Islamic State and other terrorist groups, agreeing that they twisted Muslim scripture to control ignorant people.

44.     Ahmed not only made elaborate contraptions that he took to school to show his teachers, he also fixed teachers' and students' broken electronics.  On one occasion, when a tutor's cell phone went dead, Ahmed rigged the battery and brought the cell phone back to life.  On a number of occasions, he would take students' broken electronics home and bring them back fixed.

45.     Ahmed's desire to impress his teachers was related to his desire to make connections and gain acceptance.  An example of this was shared by one of his reading buddies from Irving Bible Church.  In May 2010, Ms. Tricia Kinsman wrote an article for IBC's *Chatter* magazine describing her relationship with Ahmed at Townsell Elementary.  At first she wondered how reading with him for thirty minutes one time a week could make a substantial difference to a

little boy that could speak very little English and read none—until she saw what amazing progress he made during that third grade year.  She told of an occasion where she went to pick him up from class and he had with him a drawing of a horse that he had made.  As they walked through the halls, he showed that picture to a teacher, a librarian and the principal.   "He was so proud of it and they praised him profusely for his talent."  They read their books and she walked him back to class.  "As he entered the room, he stopped, turned around and handed me the picture without a word.  I fought back tears knowing he was giving me something he was proud of, knowing that he wanted ME to have it, and knowing why."

46.     Ahmed practiced his faith, including prayer at lunchtime.  Prayer by a Muslim has certain physical requirements, including touching your forehead on the ground.  Ahmed would leave the cafeteria to go pray where he could accomplish what he needed to do.  One day in sixth grade, the 6th Grade Vice Principal, Mr. Nguyen, saw Ahmed leaving the cafeteria and told him to go back and eat.  Ahmed attempted to explain that he was going to pray, but Mr. Nguyen said to go back and eat or there would be consequences.  Mr. Nguyen was suspicious that Ahmed did not really intend to pray.  Ahmed was required to get a permission slip from his father as well as a certification from his mosque that he was practicing his faith.  Mr. Mohamed is unaware of any Christian student required to get certification from their church before they were allowed to pray in school.

47.     Mr. Nguyen was known to have racial bias.  In fact, he went into at least three history classes and told the classes as a whole that his Asian children did not give him any problems.  He urged that the African American and Hispanic students need to be like his children.  He stated that the students were a reflection of their race and their parents.  These statements were

summarized in a complaint filed by one of the history teachers to the IISD Superintendent on

May 1, 2015.  There was no response to the complaint.

48.     After the prayer incident, Mr. Nguyen began disciplining Ahmed for various infractions,

most involving "horseplay" and giving him detentions and in school suspensions.  Ahmed was

also disciplined by other faculty for infractions involving horseplay and insubordination.  He was

referred to alternative school for allegedly poking a kid with a pencil and allegedly forcing soap

down another kid's throat.  The reality of it was that Ahmed had thrown a pencil to a kid asking

for a pencil and when it was caught, the lead poked the skin.  In the soap incident, Ahmed and

another boy were in the restroom clapping soap in their hands to make bubbles.  For these two

things, he was sent to an alternative school.  Mr. Nguyen told Ahmed that he was going to

"follow" him through middle school and even into high school.   Nguyen told Mohamed that

Ahmed needed to be "taken down a notch."  Mr. Nguyen did, indeed, become the 7th grade Vice

Principal when Ahmed went into the 7th grade and the 8th grade Vice Principal when Ahmed

went into the 8th grade.  Mr. Nguyen told Ahmed "you are not who you appear to be." On one

occasion, Mr. Nguyen saw Ahmed walking out of school and walked up to him and began

sniffing him.  He told Ahmed he "smelled like weed" and made Ahmed go to the teachers'

conference room filled with teachers, told them all Ahmed smelled like "weed" and had them all

sniff him, including the principal.  After the sniffed him, they concluded he did not smell like

"weed."  Ahmed's middle school History teacher, Mr. Kubiak, states that Mr. Nguyen "hunted"

Ahmed in middle school.

49.     The final disciplinary straw for Mr. Mohamed was when Ahmed, in the 8th grade, was

being choked by another boy.  During the choking, Ahmed tried to push the other boy off of him.

As a result, Ahmed was disciplined.  Mohamed filed a formal appeal of the discipline and it was

dropped.   During the appeal, Mohamed let it be known that he believed that Mr. Nguyen was targeting Ahmed and meting out discipline unfairly.   For example, immediately prior to the complaint being filed, Mr. Nguyen called Ahmed out in front of the class, demanding to know why he was "smiling."

50.     After the complaint about Mr. Nguyen, the constant disciplinary actions ceased.  Ahmed continued to try to impress his teachers and began to make real friends.   He even had a best friend, who we will call John Doe.   They were in the same STEM (Science, Technology, Engineering and Math) class and began to build things together.   They built a robot in their robotics group.   They participated in the SeaPerch challenge.   The motto of SeaPerch is "teach, build, become."   In that challenge, they, along with their classmates, built an underwater robot (such as those portrayed on the website).   The robot was transported on the school bus to a pool to operate.   Ahmed and John became close, trading tools and giving each other parts and pieces to build things at home.

51.     When Ahmed started high school at MacArthur high, he had plans to once again try and impress his teachers, as well as become more socially interactive.   He planned on joining the Student Council.

52.     One Friday in September 2015, in Geometry and Architecture, Ahmed saw his teacher disposing of some batteries.   Ahmed asked if he could have them and the teacher gave them to him. Ahmed taped the batteries together to simulate a little "sword."   Later that day, in English class, Ahmed was rolling the "sword" batteries down his arm and his English teacher, Ms. West, asked him what he was doing.   Ahmed told her that he was going to build something and he would show it to her on the following Monday.

53.    That weekend, Ahmed trolled the garage for treasures. He found an old 8 ½" by 5"
Vaultz pencil box from middle school (still sold on Amazon with animals, butterflies, etc.), a 7
segment display, a pcb board, a 9 volt battery, some wires (from a media player that wasn't
working), a 120-240 volt transformer, a button board and some tools. On Sunday night, after
returning from skating with some friends, he soldered the battery connector to the pcb board
giving it back-up power. He then soldered the transformer to the pcb board which powers the
seven segment display and the alarm clock bell. He screwed the display into the pencil box.
The "alarm clock" would make a beeping noise when the set time was reached. He put the clock
in his backpack like he always did. In Ahmed's mind, he built the clock to show to Ms. West.

54.    On Monday, September 14, 2015, Ahmed took the pencil box out of his backpack and
showed the clock to his Geometry and Architecture teacher, Mr. Lemons. Mr. Lemons told
Ahmed that the clock was "really nice," but advised that he should keep it in his backpack.
During 4th period English, Ahmed could not resist showing how his clock worked to another
student and it made a beeping sound. Ms. West heard the noise but didn't know where it came
from. Ahmed waited until class was over and the other students were gone when he reminded
Ms. West that he had told her he was going to build something that weekend and bring to show it
to her. He asked her if she wanted to see it and she said that she did. Ahmed plugged the clock
in and showed her how it worked. Ms. West asked Ahmed "is that a bomb?" Ahmed was
surprised and confused. In all the many times he had built contraptions and taken them to his
teachers, none had ever asked him that. Ahmed replied, "no, it's an alarm clock, see?" Ms.
West then told Ahmed she would hold it for him and give it back at the end of the day. She
placed the pencil box on her desk. For the next several hours, the home-made clock was out of

Ahmed's hands.   There was no alarm raised, no evacuation, no bomb squad called.   Nothing happened at all.

55.     The school had an emergency protocol to follow in the event of a bomb threat.   That protocol was not engaged.   Just a couple of weeks after the clock incident, a person called in a bomb threat and the entire school was evacuated in accordance with the emergency protocol.

56.     Several hours after Ms. West took Ahmed's pencil box, during Ahmed's college prep class, called AVID, Principal Daniel Cummings and Irving police Officer Robin Howman walked in to Ahmed's class and escorted him out.   They took Ahmed to another room in the school where four more Irving police officers and the school counselor, Ms. Wong, were awaiting Ahmed's arrival.   When Ahmed came in the room, Officer Charles Taylor, a school resource officer, said "yep, that's who I thought it was."   Ahmed found this quite unnerving as he had never had any direct experience with that officer.

57.     Ahmed was interrogated for almost an hour and a half by the Irving police, despite his pleas for his parents.   The Irving police, the Mayor of Irving and the IISD have all represented to the public that Ahmed was "less than forthcoming" during his interrogation.   However, Ahmed repeatedly told them that it was an alarm clock, not a bomb, which was true.   He repeatedly told them that he had made it to show his English teacher, which was true.   The clock functioned as a crude alarm clock.   Ahmed never represented that it was anything else, he never made any threats of harm, he never said he had a bomb, and he never attempted to scare anyone or cause alarm.   Ahmed never misrepresented a single thing.   Tellingly, the Irving police eventually dropped the charges for which they arrested him and it was stated that there was no proof that Ahmed had "intent to cause alarm."

58.     During the interrogation, Ahmed repeatedly asked for his parents.  When he asked for his parents, he was told that he could not talk to his parents because he was in the middle of an interrogation.  Certainly it is not unexpected that a boy being interrogated by numerous police officers and school administrators who were accusing him of illegal activity would be scared, confused, intimidated and want his parents.

59.     During this interrogation, Principal Cummings told Ahmed to write a statement and threatened to expel him if he did not.  Terrified, Ahmed did not want to write anything.  But because he was threatened and really didn't have anything to hide, he did write for them that he made an alarm clock and the authorities thought it was a bomb (as that was what they were telling him).

60.     Despite the fact that Ahmed had told them about making the clock, despite the fact that they realized that it was, indeed, a crude alarm clock, despite that fact that nobody—not one single person—alleged that Ahmed had tried to scare them with it, had claimed it was a bomb or weapon or tried to cause alarm, despite the fact that nobody had cleared their classroom, called for emergency protocol or called in a bomb squad, Ahmed was arrested.  The officers pulled him forcefully out of his chair, yanked his arms up behind his back so far that his right hand touched the back of his neck, causing a lot of pain.  They placed Ahmed in handcuffs and marched him out of the front of the school, four officers grabbing onto him, two on each side holding his hands and his arms.  They put him into the back of a police car.  They took him to the police station and booked him as a criminal, with mugshots and fingerprinting—all still without his parents.

61      As he was being escorted out of the room, Ahmed saw the look on his school counselor, Ms. Wong's, face.  She knew what was happening was wrong.  She knew that Ahmed was a

good kid.  In fact, in the first few weeks of school, Ahmed had already received two separate special tickets or tokens that were given out to kids who exhibited exceptional behavior and that could be redeemed for something special at the counselor's office.

62.     A "hoax" is "something intended to deceive or defraud."  Ahmed's Geometry teacher asked him what he had made and he said "an alarm clock."  Ahmed's English teacher asked him what he had made and he said "an alarm clock."  The principal and the police asked Ahmed what he had made and he said "an alarm clock."  There is no telling how many times that day Ahmed explained that he had made "an alarm clock."  There was not a single person who stated that Ahmed had said anything "intended to deceive or defraud."  As far as what the device looked like, the most telling thing so far (besides looking at it wherein it is incredibly obvious that it is not a bomb) is the Irving police internal email obtained through a FOIA request where the officer candidly chides the others and states "that thing doesn't even look like a bomb."  The pencil box is one that Ahmed carried throughout the seventh grade without a problem.  You can buy the same one right now on Amazon (Vaulz pencil box) for $14.99 (the one with Minions on it is a little more expensive).

63.     Ahmed's father arrived at the police station to find out what was happening with Ahmed. As he waited, Officer Howman came to speak with him.  Officer Howman indicated that Ahmed had been arrested for taking a "hoax bomb" to school and that he was being processed and fingerprinted.  Ahmed's father, extremely confused and upset, asked Officer Howman what a "hoax bomb" was, but she would only state that he was being processed and fingerprinted. Ahmed's father tried to explain that Ahmed was very interested in robotics and creating things, but Officer Howman was unwilling to listen to any explanations.

64.     Shortly thereafter, Officer Mitchell arrived and simply repeated that Ahmed had been arrested for a "hoax bomb" and was being processed.  He, too, was unwilling to listen to any explanations from Ahmed's father and simply repeated the same information over and over.

65.     After Ahmed's mother and sister arrived, Ahmed's father asked if he could see Ahmed and find out what happened.  Officer Mitchell told him that he could not at that time until the arrest was processed and completed.  Shortly thereafter, Officer Taylor brought Ahmed, still in handcuffs, to his family. In doing so, Taylor shoved Ahmed as he walked, directing him to "hurry up."

66.     After speaking with Ahmed (while still handcuffed), his father expressed that Ahmed had done nothing wrong and the charges should be dropped.  The officers were unwilling to have any discussion about that possibility.

67.     As the family was leaving, they asked for Ahmed's electronic tablet to be returned, since that had nothing to do with why he was detained or arrested and it was how Ahmed completed his homework.    While police memos characterize Ahmed as "yelling" and "rude," he was neither yelling nor rude, simply attempting to explain why it seemed like his tablet (not the pencil box) should be returned to him.  Surely police cameras will have captured the exchange. Furthermore, police memos complain that Ahmed's mother and sister were speaking in a language that they did not know and were "saying things that we could not understand."  At the time, Ahmed's sister was interpreting events for her mother as her mother was not fluent in English.  The response of Officer Mitchell was to threaten that if the family did not leave immediately, there would be criminal charges brought against them, too.

68.     Subsequently, the Chief of Police admitted that the arrest of Ahmed was a "mistake" and the charges were dropped.    Nevertheless, the district disciplined Ahmed and placed him on a

three-day suspension.  Mohamed received an email from Vice Principal Patrick Smith late on September 14, 2015 stating that Ahmed would be suspended for three days from school and "all" IISD properties for violation of the Student Code of Conduct, possession of prohibited items. However, Ahmed had not been in possession of any of the prohibited items on the list.

69.     The United States Department of Justice has opened an investigation into the conduct of the Irving Independent School District, not just with respect to the treatment of Ahmed Mohamed, but regarding its pattern of discrimination.  A justice department official stated that "the Civil Rights Division has an investigation into the Irving School District regarding both harassment and the discipline of students on the basis of race, religion and national origin."  That investigation is currently ongoing.

<center>CAUSES OF ACTION</center>

V.     42 U.S.C. § 1983

70.     All allegations contained in paragraphs 7 through 69 above are hereby incorporated into this count of Plaintiff's Petition.

71.     Plaintiff's rights were violated in contravention of the Fourth and Fourteenth Amendments of the United States Constitution.

A.     <u>Fourteenth Amendment</u>

72.     Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against both IISD and Defendant Cummings, individually, based upon violations of the Equal Protection Clause of the Fourteenth Amendment.

73.     The concept of equal protection and equality in the United States is as old as the country itself.  In 1776, the founding fathers incorporated the idea of equality into the foundation of our country—the Declaration of Independence:

*We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain inalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.*

The Equal Protection Clause found in the United States Constitution is designed to memorialize the "equality" declared by our forefathers into law.  But "equal protection" has always been subject to the interpretation of the times.  To quote a brilliant Supreme Court justice, "[t]here is no longer the slightest excuse, reason, or justification for further postponement of the time when every public school system in the United States will be a unitary one, receiving and teaching students without discrimination on the basis of their race or color."   Justice Hugo Black, *Alexander v. Holmes County Bd. of Education*,

**Irving Independent School District**

74.    In the IISD, there was a clear pattern of discrimination based upon race as well as discrimination based upon religion.

75.    A pattern of race discrimination in the IISD is not only clearly demonstrated by the disciplinary statistics gathered by the Texas Education Agency, it was openly acknowledged by the district, including the Trustees.  During the years for which statistics are available (2007 through 2015), black/African American students in the IISD were approximately twice as likely to be disciplined as white students.

76.    This pattern of discriminatory discipline was known to the Trustees and, in fact, in 2009 they hired Dr. Mack Hines to conduct a study relating to such disparity.  However, when Dr. Hines' report verified the ongoing discrimination, the Trustees rejected the findings and refused to implement the suggested corrective actions.  Subsequently, while the discrimination in discipline continued, and continued to be reported to the Board, there was no effective action

taken to address it or correct it.   Any action taken did not serve to substantially reduce or eliminate the discrimination.

77.     There can be no clearer indication of discrimination than the pattern of discrimination in discipline against African American students at the IISD consistently for the eight years reported. While the Trustees were aware of it, they did not eliminate or correct it.   The clear message was that it was acceptable to discriminate against African American children in applying discipline in the IISD.   And that is just what happened.   The pattern of over-disciplining African American children led directly to the over-discipline of Ahmed Mohamed for showing off his home-made clock-in-a-pencil-box to his teacher.   Obviously, none of the administrators or police officers thought it was a bomb since there was no emergency protocol activated and no sense of genuine concern or panic.   In fact, they had the device plugged in and operating in the room while interrogating Ahmed for almost an hour and a half.   It couldn't be a "hoax" bomb because Ahmed had never represented it to be anything other than an alarm clock and they could find no "intent to cause alarm."   Despite the fact that there was no legitimate basis for any discipline at all, Ahmed was arrested, charged and suspended from school.

78.     The persistent and widespread practice of IISD officials or employees in discriminatory discipline against black/African American students was consistent for the eight years of data provided by the TEA.   It was so common and well settled as to constitute a custom that fairly represented school district policy.   The Trustees were completely aware of the discrimination, as demonstrated by both the TEA data and Dr. Hines' report.   However, the Trustees chose not to implement the recommendations of Dr. Hines and the discrimination was not abated.   The inaction of the Trustees, particularly combined with the verbally expressed discriminatory

attitude of the Board President, constitutes deliberate indifference to the rights of Ahmed Mohamed and such indifference is a closely related cause of his injuries.

79.     While the TEA does not track religious statistics, there are studies and reports reflecting the discriminatory attitude—amounting to paranoia—of the Irving Trustees relating to the Muslim religion.  In 2010, the Texas State Board of Education adopted a resolution curtailing references to Islam in school textbooks.  The resolution, addressing alleged anti-Christian bias, claimed that "more such discriminatory treatment may occur as Middle Easterners buy into the U.S. public school textbook oligopoly, as they are doing now."

80.     The anti-Muslim paranoia reached fever pitch in Irving in 2012.  In October 2012, a woman named Ginger Russell sent out a chain email with the subject "Irving ISD Indoctrinating Islam" to school board members and district officials.  The email warned that "Christians are going to have to stand up against the pro-Islamic teaching in our public schools with CSCOPE curriculum."  She also posted a letter to a Tea Party website saying that CSCOPE had "Marxist" views.  The Board got in touch with officials who reassured them the curriculum met state guidelines and the email was wrong.  However, Trustee Jones insisted on more.  They hired a "very socially and fiscally conservative" former teacher to "seek out" any Islamic bias in CSCOPE.  The investigation resulted in a 72 page report listing every religious reference in the CSCOPE curriculum.  The results indicated that Christianity got twice as much attention in the curriculum as any other religion and if there was any bias in CSCOPE, it was "bias against radical Islam."    That bias permeated IISD and contributed to the unwarranted discipline of Ahmed Mohamed.

**Principal Daniel Cummings**

81.     Principal Daniel Cummings is sued in his individual capacity for violating Ahmed Mohamed's clearly established constitutional right to be free from discriminatory discipline. That right was clearly established in September 2015 and a reasonable principal would have understood that his or her conduct violated the right in issue.  In fact, no reasonable principal could have believed that his or her conduct was lawful under the circumstances.  The rights of African American Muslims to be free from discrimination in public schools was well-established by Congress long before the events of September 2015.

82.     At the time that Ahmed was detained by Principal Cummings and the Irving Police Department, Principal Cummings was aware of the TEA's reports reflecting the disparity in discipline of African American students that was ongoing in the IISD.  He was also aware of the requirements of the Texas Family Code, specifically V.T.C.A. Family Code § 52.02(b) which states as follows:

> (b) A person taking a child into custody shall promptly give notice of the person's action and a statement of the reason for taking the child into custody, to:
> (1) the child's parent, guardian, or custodian

Principal Cummings knowingly violated the provisions of the Family Code requiring prompt notice to Ahmed's parents because he was attempting to force Ahmed into signing some kind of "confession" without the benefit of his parents or legal counsel, to which he was entitled. Cummings was aware of Ahmed's requests to have his parents notified and present and deliberately ignored those requests.

83.     Cummings was not a mere bystander to the interrogation of Ahmed at the school.  He not only participated, he threatened Ahmed with expulsion if he didn't sign a statement, in complete violation of Ahmed's rights and his own responsibilities as the principal of the school and

guardian of its students.  At the time that Cummings engaged in such violations of the law, he was aware of all of the facts that would inform a reasonable principal that there was no conduct meriting discipline—much less police intervention.  He was aware that the clock was not a bomb.  He was aware that there was no allegation or statement or representation by Ahmed that it was a bomb.  He was aware that there had been no hysteria, evacuation, or bomb squad called.  He was aware that Ahmed had not threatened anyone nor was there any indication of intent to cause alarm.  Every indication at the point that Cummings violated the law in the Family Code was that Ahmed was simply trying to impress his teachers with his mechanical/engineering skills.  Still he brought in the police, participated in the illegal interrogation of Ahmed and threatened him with expulsion if he didn't sign a statement.

84.    As telling as the threats and interrogation are, even more telling is the fact that the school suspended Ahmed for three days when even the police acknowledged there was no evidence that Ahmed had any "intent to alarm" anyone.    Principal Cummings knowingly violated the Fourteenth Amendment and the rights of Ahmed Mohamed.

B.    Fourth Amendment

**Irving Police Department**

85.    The Fourth Amendment right to be free from unconstitutional arrests has been established for decades.  Irving police officers violated Ahmed Mohamed's rights when they refused his request to talk to his parents and arrested him without probable cause on September 14, 2015.

86.    The Irving police department's history of unconstitutional arrests goes back at least as far as 2006, when Irving began its Criminal Alien Program (CAP).  Run by the Department of Homeland Security, the CAP program was meant to give local law enforcement officials access to Immigration and Customs Enforcement (ICE) information and personnel to facilitate the

identification of serious, dangerous criminals and deport them. A report by the University of California, Berkeley School of Law proved that CAP lead to rampant profiling and wrongful arrests by the Irving police department.

87.    The Berkeley report found that during the Irving police force's participation in CAP, there was a 150 percent increase in arrests for petty crimes, including minor misdemeanors and traffic offenses.    Congress made clear that ICE "should have no greater immigration enforcement priority than to remove deportable aliens with serious criminal histories from the Unites States." But the results of Irving's aggressive arrest policies didn't target serious criminals.    Once CAP was implemented in Irving, felony charges only accounted for 2 percent of the ICE detainees, while 98 percent of detainees were charged with misdemeanor offenses.    As a result, Irving police officers engaged in a pattern of unconstitutional detentions/arrests and the arrest of Ahmed Mohamed was part of that pattern.    As a result, the City is directly liable for the Fourth Amendment violations under § 1983.

88.    Additionally, the Irving police department failed to properly train and/or supervise its officers with respect to determining probable cause for an arrest.    The inadequacy of police training may serve as the basis for § 1983 liability where the inadequacy amounts to deliberate indifference to the rights of persons with whom police come into contact, constituting an actionable city policy or custom.    Irving police officers engaged in a pattern of unconstitutional detentions/arrests at least as far back as 2006.    This pattern of unconstitutional detentions/arrests was acknowledged by the Irving Chief of Police.

89.    With respect to unconstitutional arrests, the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City of Irving can reasonably be said to have been deliberately indifferent to

the need.  The City was aware of a pattern of unconstitutional arrests and was aware that the failure to provide additional and appropriate training was likely to result in the violation of constitutional rights.  Thus, the failure to provide such additional appropriate training amounted to deliberate indifference.  That deliberate indifference lead Irving police officers to arrest Ahmed Mohamed without probable cause.

90.    Defendant officers violated Ahmed Mohamed's right to be free from unreasonable seizure of his person and their actions were objectively unreasonable and violated Ahmed's Fourth Amendment rights.    The knowing and intentional nature of the violation is indicated further by the fact that the officers deliberately violated Ahmed's Fifth Amendment rights and refused his legitimate request to speak to his parents.

91.    The United States Supreme Court adopted a set of prophylactic measures designed to safeguard the constitutional guarantees of persons in police custody from police misconduct. Prior to questioning, a person must be warned that he has a right to remain silent and the right to presence of an attorney.  These measures are in place to address the coercive nature of custodial interrogation and are required when a person is in custody.  Not only do the protections apply to juveniles, they are even more necessary under such circumstances, as juveniles are particularly susceptible to intimidation and coercion.  Not only did these officers fail to explain Ahmed's rights to him, they misrepresented his rights and attempted to force him to write a "confession." This is the very thing that the prophylactic measures are designed to protect against.  No reasonable officer would have believed that a person could be forced to write out a statement while in custody and under interrogation, without being informed of his rights.  This demonstrates the effects of the lack of appropriate training of these officers.

92.     There was very clearly no probable cause to believe that Ahmed had committed any crime.  The officers were well aware that the home-made clock was not a bomb, as indicated by their actions in plugging it in and keeping it in the room with them for almost an hour and a half while they interrogated Ahmed.  They had no information at all that a single person claimed that Ahmed had made any threats, caused any serious alarm or intended anyone to believe that the clock was anything but a clock.  It defies common sense to say that because it had wires and electronics, it looked like a bomb.

93.     Defendants are liable to Plaintiff for actual damages and compensatory damages, together with a statutory attorney's fee as authorized by 42 U.S.C. § 1988.

VI.     TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d

94.     All allegations contained in paragraphs 7 through 69 above are hereby incorporated into this count of Plaintiff's Petition.

95.     No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied in the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.
42 U.S.C. § 2000d

96.     In calling for its enactment, President John F. Kennedy identified "simple justice" as the justification for Title VI:

> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion, which encourages, entrenches, subsidizes, or results in racial discrimination.   Direct discrimination by Federal, State, or local governments is prohibited by the Constitution.   But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation.

97.     After President Kennedy's death, President Johnson continued to push for the Title VI legislation.  In addressing Congress, Johnson gave a powerful speech:

> I speak tonight for the dignity of man and the destiny of democracy.   I urge every member of both parties, Americans of all religions and all colors, from every section of

this country, to join me in that cause.  At times history and fate meet at a single time in a single place to shape a turning point in man's unending search for freedom….There is no cause for self-satisfaction in the long denial of equal rights of millions of Americans….Our mission is at once the oldest and most basic of this country:  to right wrong, to do justice, to serve man.

**Irving Independent School District**

98.     IISD is a recipient of federal financial assistance, thus subject to the provisions of Title VI.  IISD has a pattern of engaging in racial discrimination specifically with respect to student discipline, the issue directly involved in this lawsuit.  Additionally, the racial discrimination in IISD in all aspects of education has been clearly evident since, at the very least, the Hines report.

99.     In 2009, after determining that IISD had a "disproportionate number of African American students being sent to disciplinary and alternative education compared to other ethnic groups," the district hired Dr. Mack Hines to provide professional development expertise to teachers on how to develop desired positive behavioral responses from African American students in the classroom.  Dr. Hines conducted a study and created a report titled "The Skin They're In."

100.    Dr. Hines' report explained the "need to evaluate the school-related experiences and beliefs of the African-American elementary school child" in the IISD.  His study investigated 124 African-American fifth grade students' experiences in 20 elementary schools in the IISD. He collected and analyzed both statistical data and anecdotal information from the students.  His findings relative to the elementary school experience for these children included that they felt "isolated," were the targets of ongoing racial slurs, and felt "alienated by teachers."  There was a substantial amount of anecdotal evidence from these children ("I just want to be something else other than black at that moment," is but one heartbreaking example).

101.    Hines' study found that the most frequently cited area of racial disparity was school discipline practices.   They were reprimanded differently and received suspensions more

frequently.    Over and over again, students reported examples of different treatment that they perceived was race based.

102.    The study by Dr. Hines also examined what he termed "access to equality-based structures," defined as rights that should be afforded to all students, ranging from dress code to using the restroom.  The African-American students reported serious differences in treatment in these areas as well.   On one campus, several students reported that non-African-American students were allowed to use the restroom any time of the day but most African-American students had specific times of the day that they could ask to use the restroom.    That is but one example of the many that were given but it demonstrates the extent of the differences in treatment.

103.    Dr. Hines concluded that the findings from his study pointed to "dysconcsious racism," knowingly or unknowingly discriminating against people because of race.  He stated that the underlying premise for this type of racism is the acceptance of dominant white norms and privilege.  He explained that dysconcious racism is based on treating people differently if they do not assimilate norms that have been controlled or sanctioned by white culture.   Dr. Hines concluded with a long list of recommendations on how to address the problem of racism in the IISD.  However, the Board declined to implement Dr. Hines' recommendations to address the problem of race discrimination—and specifically discriminatory discipline—and such discrimination continued.

104.    The President of the Board of Trustees in 2015, Steven Jones, has made comments specifically referencing the race of the Board President whom he replaced.  Not surprisingly, after Jones took over as President, the discrimination continued.  The TEA stats make it clear that black/African American children continued to be the targets of discriminatory discipline.

105.    Additionally, the anti-Muslim sentiment made official policy by the Texas State Board of Education in 2010 and adopted by the IISD Trustees as reflected in their 2012 "investigation" of the curriculum to ferret out pro-Islam textbook references, reflects a bias that permeated IISD and contributed to the unwarranted discipline of Ahmed Mohamed.

106.    The ongoing discrimination in the IISD was a direct and producing cause of the actions against Ahmed Mohamed on September 14, 2015.  As a result of the discriminatory intent of IISD employees, Ahmed is entitled to compensatory damages.

107.    There is a misperception that after his arrest, Ahmed lived a life of prosperity.  That is far from true.  He has been vilified and the target of incredible hate.  Because of all of the lies and conspiracy theories thrown out about Ahmed and his family, he has received not just hate messages, but death threats.  Some of the examples of things sent to and said about this fourteen-year-old boy include "#Bin Laden Reincarnated Anyone?"  "You're not welcome here"  "That little bastard needs to leave American soil"  and even one with a picture of a plastic bag and a message: "A new invention for breathing underwater.  Put this on your head and jump in."  These messages of hate to a boy who did nothing wrong and who was just trying to be a regular American teenager were ugly, mean and incredibly destructive.  No kid in this country should have to endure such hatred.  No one would have their child subjected to such evil.

## JOINT AND SEVERAL LIABILTY

108.    All Defendants are jointly and severally liable.

## DEMAND FOR JURY

109.    Plaintiff requests a trial by jury.

CONCLUSION AND PRAYER

110.    This is one of those moments where "history and fate meet at a single time in a single place to shape a turning point in man's unending search for freedom."  Will we be faithful to our American principles of equality and freedom or will we let fear and hate prevail, the two biggest evils that will defeat our democracy?  History tells us that when we have stood tall and proud for equality and freedom, we have grown as a nation.  When we have given in to fear and hate, we flounder.  In the words of Abraham Lincoln "America will never be destroyed from the outside. If we falter and lose our freedoms, it will be because we destroyed ourselves."  In the case of Ahmed Mohamed, we have the opportunity to take a stand for equality and for justice, two things that should prevail above all else.

THEREFORE, Mohamed Elhassan Mohamed, as next friend of Ahmed Mohamed, prays for judgment against all Defendants for actual and compensatory damages, declaratory relief, injunctive relief, and for statutory attorneys' fees, costs, and expenses, as well as punitive damages against the individual Defendants, as well as all other additional relief as the Court deems just and proper.

<div style="margin-left:40%">

Respectfully submitted,

s/Susan E. Hutchison
Susan E.  Hutchison
Texas Bar No. 10354100
hutch@hsjustice.com
Christopher E. Stoy
Texas Bar No. 24075125
cstoy@hsjustice.com

HUTCHISON & STOY, PLLC
509 Pecan St., Ste. 201
Fort Worth, TX  76102
(817) 820-0100
817.820.0111 fax

ATTORNEYS FOR PLAINTIFF

</div>