# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| MOHAMED ELHASSAN MOHAMED, § | |
| as next friend for A.M., a Minor, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:16-cv-2283-L |
| § | |
| IRVING INDEPENDENT SCHOOL § | |
| DISTRICT, DANIEL CUMMINGS, in his § | |
| individual capacity, and CITY OF § | |
| IRVING, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

Before the court are: Defendant City of Irving's Motion to Dismiss (Doc. 8), filed October

6, 2016; Defendant Irving Independent School District's Motion to Dismiss and Motion to Strike

(Doc. 10), filed October 11, 2016; Defendant Daniel Cummings's Motion to Dismiss and Motion

to Strike (Doc. 11), filed October 11, 2016; and Defendant Irving Independent School District and

Daniel Cummings's Joint Motion to Stay Discovery Pending Resolution of Motions to Dismiss

(Doc. 22), filed December 1, 2016. Having considered the motions, responses,[1] replies, pleadings,

record, and applicable law, the court **grants** Defendant City of Irving's Motion to Dismiss (Doc. 8);

**grants** Defendant Irving Independent School District's Motion to Dismiss and **denies as moot** its

Motion to Strike (Doc. 10); **grants** Defendant Daniel Cummings's Motion to Dismiss and **denies**

---

[1] In Plaintiffs' Response to Defendant City of Irving's Motion to Dismiss (*see* Doc. 15), Plaintiff has modified the caption to the lawsuit to contain individual police officers as Defendants. Plaintiff has not asserted any claims against these individuals in the live pleading. *See* Compl. (Doc. 1). The City has objected to this "unauthorized and inappropriate modification" of the caption. *See* City's Reply 2 (Doc. 18). The court **sustains** the City's objection and, accordingly, **strikes** the names of the individual officers from the caption in Docket No. 15.

**as moot** his Motion to Strike (Doc. 11); and **denies as moot** Defendant Irving Independent School District and Daniel Cummings's Joint Motion to Stay Discovery Pending Resolution of Motions to Dismiss (Doc. 22). Plaintiff will be permitted to file an amended pleading to the extent herein set forth.

## I. Background

This is an action for monetary and injunctive relief under 42 U.S.C. § 1983 against Defendants Irving Independent School District ("IISD"); Principal Daniel Cummings ("Principal Cummings"), sued in his individual capacity only; and the City of Irving (the "City"). Also, this is an action against the IISD for alleged violations of Title VI of the Civil Rights Act of 1964. Plaintiff, Mohamed Elhassan Mohamed, a Sudanese immigrant who is now a United States citizen, brings this lawsuit as next friend for his minor son, A.M., who is an African-American Muslim and a former student at McArthur High School ("McArthur"), a public high school in the IISD.[2]

The lawsuit arises from A.M.'s September 14, 2015 arrest and three-day suspension from McArthur after he brought to school a homemade contraption containing wires and batteries that made a beeping sound. Plaintiff alleges that both the IISD and Principal Cummings violated A.M.'s Fourteenth Amendment constitutional right to equal protection of the laws when Principal Cummings imposed a three-day suspension from school to discipline A.M. after he brought the device to school. In addition to his section 1983 claims against the IISD and Principal Cummings, Plaintiff contends that the IISD violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), by discriminating against him on the basis of his race and religion. Plaintiff has also

---

[2] Although the caption to the Complaint states the full name of A.M., the court uses his initials, as A.M. is a minor. *See* Fed. R. Civ. P. 5.2(a).

sued the City, alleging violations of A.M.'s rights under the Fourth and Fifth Amendments to the

Constitution in connection with his interrogation and arrest by police officers employed by the City.

The court now sets forth the facts drawn from Plaintiff's Original Complaint ("Complaint"),

the live pleading. *See* Compl. (Doc. 1). The court accepts all well-pleaded facts in the Complaint

as true and views them in the light most favorable to Plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*

*Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

### A. Allegations Relating to September 14, 2015 Arrest and Suspension of A.M.

On September 14, 2015, A.M., then a 14-year-old freshman, brought a homemade device to

school in an "8 ½" by 5" Vaultz pencil box" that included "a 7 segment display, a pcb board, a 9 volt

battery, some wires (from a media player that wasn't working), a 120-240 volt transformer, [and]

a button board." Compl. ¶ 53. A.M. showed the device to one of his teachers who advised him to

keep it in his backpack. *Id.* ¶ 54. Later that same day, notwithstanding the teacher's instruction,

A.M. showed the device to another student during a class. *Id.* The device made a beeping sound and

caught the attention of his English teacher, Erin West ("Ms. West"). *Id.* A.M. showed Ms. West

the device after class, and she asked: "[I]s that a bomb?" *Id.* A.M. told her it was an alarm clock.

*Id.* Ms. West confiscated the device from A.M., and it was held in the administrative offices of the

school for several hours. *Id.*

Later that same day, Principal Cummings and City of Irving police officer Robin Howman

("Officer Howman") removed A.M. from the classroom and escorted him to a room where four or

more City police officers and a school counselor were waiting. *Id.* ¶ 56. A.M. was questioned for

"almost an hour and a half by the Irving police, despite his repeated pleas for his parents." *Id.* ¶¶ 57-

58. A.M. repeatedly informed those present that the device was an alarm clock that he had made to

show his English teacher, not a bomb.  A.M. never stated the device was anything other than a clock, never threatened anyone with harm, never claimed to have made a bomb, and never attempted to scare or cause alarm to anyone.  *Id.* ¶ 57.  When he asked for his parents, he was told that he could not speak with them because he was in the middle of an interrogation.  *Id.* ¶ 58.  During the interrogation, Principal Cummings told A.M. to write a statement and "threatened to expel him if he did not."  *Id.* ¶ 59.  A.M. was "terrified" and did not want to write anything.  *Id.*  Ultimately, because he was threatened and did not have anything to hide, he wrote in a statement that he made an alarm clock that the authorities thought was a bomb.  *Id.*

Despite A.M.'s insistence that the device was an alarm clock, and not a bomb, the police officers present in the room forcefully pulled him out of his chair, handcuffed him, and arrested him.  *Id.* ¶ 60.  The police officers took A.M. to the police station and "booked him as a criminal, with mug shots and fingerprinting—all still without his parents."  *Id.*

Thereafter, A.M.'s father arrived at the police station and, as he waited to see his son, Officer Howman came to speak with him and informed him that A.M. had been arrested for taking a "hoax bomb" to school and that he was still being processed and fingerprinted.  *Id.* ¶ 63.  A.M.'s father tried to explain to Officer Howman that A.M. was interested in robotics and created things, but she was unwilling to listen to his explanations.  *Id.*  Officer Mitchell then arrived on the scene and repeated to A.M.'s father that A.M. had been arrested for brining a "hoax bomb" to school, and was similarly unwilling to listen to A.M.'s father's explanations.  *Id.* ¶ 64.  A.M.'s mother and sister arrived, and the family was able to see A.M. after processing.  *Id.* ¶ 65.  After seeing their son, they were instructed to leave the premises or risk having charges brought against them.  *Id.* ¶ 67.

Later that evening, A.M.'s father received an e-mail from Vice Principal Patrick Smith, stating that A.M. would be suspended from McArthur for three days for violating the Student Code of Conduct by possessing prohibited items. *Id.* ¶ 68. A.M. alleges that he was not in possession of any items prohibited by the Student Code of Conduct. *Id.* All charges against A.M. were ultimately dropped, and the City of Irving police chief admitted that the arrest of A.M. was a "mistake." *Id.*

Plaintiff alleges that the "United States Department of Justice has opened an investigation into the conduct of the [IISD], not just with respect to the treatment of [A.M.], but regarding its pattern of discrimination." *Id.* ¶ 69. Plaintiff alleges that the investigation is ongoing. *Id.*

**B.    Allegations Relating to Racism in the IISD**

According to the Complaint, the IISD has an "ugly history of race struggles," and the State of Texas and the IISD have a "history of discrimination against Muslims in Texas curriculum and schools." *Id.* ¶ 9. Data from the Texas Education Agency ("TEA") show racial disparities in student discipline in the IISD between 2007 and 2015. *Id.* ¶¶ 15-22.

In 2008, the IISD's then-Superintendent entered into a "Memorandum of Understanding" with the Irving Education Coalition in which the IISD agreed that it would have the data showing racial disparities in student discipline and allegations of discrimination based on race analyzed. *Id.* ¶ 23. The IISD hired Dr. Mack Hines ("Dr. Hines") "to provide professional development expertise to teachers on how to develop desired positive behavioral responses from African American students in the classroom." *Id.* ¶ 24. Dr. Hines conducted a study and created a report titled "The Skin They're In." *Id.* In the report, Dr. Hines "found that the most frequently cited area of racial disparity was school discipline practices" and that African-American students were "reprimanded differently and received suspensions more frequently." *Id.* ¶ 26. Dr. Hines concluded that the findings from

his study pointed to "dysconscious racism," which is "knowingly or unknowingly discriminating against people because of race." *Id.* ¶ 28. In September 2011, the Board of Trustees met with Dr. Hines concerning his study and report and "reacted to the negative manner in which the report was received (particularly where it concluded there was an IISD 'race war' between Hispanics and African-Americans) by determining that Dr. Hines went beyond the scope of what he was hired to do, did not use proper methodologies and they declined to implement his recommendations to address the problems." *Id.* ¶ 30.

In 2011, Dr. Steven Jones ("Dr. Jones"), a white male, campaigned for election on the IISD Board of Trustees against Nancy Jones, an African-American female incumbent, and during the campaign he made racially charged statements, including calling the IISD a "black town" and stating that "a vote for me is a vote against a black controlled school district." *Id.* ¶ 29. After Dr. Jones was elected, he filed two unsubstantiated complaints against the IISD's then-Superintendent, Dr. Dana Bedden ("Dr. Bedden"), an African-American male, and declared his intent to get Dr. Bedden fired. *Id.* In 2013, the IISD investigated Dr. Jones, and he was ultimately censured by the Board of Trustees for violating numerous school policies, including forbidding persons in the IISD from speaking Spanish. *Id.* ¶¶ 32-34. Following his censure, there were new school board elections and Dr. Jones was successful in filling the school board with "like-minded people." *Id.* ¶ 34.

### C.     Allegations Relating to City's Implementation of the Criminal Alien Program

In 2006, the City instituted the Criminal Alien Program ("CAP"), a program run by the Department of Homeland Security that "was meant to give local law enforcement officials access to Immigration and Customs Enforcement ("ICE") information and personnel to facilitate the identification of serious, dangerous criminals and deport them." *Id.* ¶ 36. A report by the University

of California, Berkeley School of Law indicated that CAP "leads to rampant profiling and wrongful arrests." *Id.* The report found that during the City of Irving Police Department's participation in CAP, there was a 150% increase in petty crimes arrests. *Id.* Plaintiff alleges that "Congress made clear that ICE should have no greater enforcement priority than to remove deportable aliens with serious criminal histories from the United States." *Id.* Plaintiff further alleges that "the results of Irving's aggressive arrest policies didn't target serious criminals." *Id.* Plaintiff contends that after the City of Irving Police Department implemented CAP, only 2% of ICE detainees were subject to felony charges, while 98% were charged with misdemeanor offenses. *Id.* Plaintiff alleges that "[a]s a result, Irving police officers engaged in a pattern of unconstitutional arrests." *Id.*

### D.    The Federal Lawsuit[3]

On August 8, 2016, Plaintiff filed this federal action as next friend of his minor son, A.M. Plaintiff seeks an award of monetary damages against Principal Cummings, alleging that he subjected A.M. to discriminatory discipline based on race and religion when he removed A.M. from class, sought a written statement from A.M., and placed him on a temporary three-day suspension from school, thereby violating A.M.'s Fourteenth Amendment right to equal protection of the laws. Plaintiff also seeks monetary damages against Defendant IISD under 42 U.S.C. § 1983, alleging that Principal Cummings was acting pursuant to an unconstitutional custom or practice of discriminatory discipline against African-American students sanctioned by the IISD's Board of Trustees. In addition, Plaintiff seeks monetary damages against the IISD under Title VI, contending that A.M.'s

---

[3] The court takes judicial notice that on September 21, 2016, Plaintiff filed a related state court lawsuit against various media outlets and reporters, including Glenn Beck and Fox Television Stations LLC, asserting state law claims of defamation in connection with media coverage of A.M.'s suspension and arrest. *See Mohamed v. The Blaze, Inc., et al.*, Cause No. DC 16-12579, in the 162nd Judicial District Court, Dallas County, Texas. That case has since been dismissed as to all Defendants except one. Plaintiff has filed a notice of appeal with respect to the court's decision to grant the various Defendants' motions to dismiss and for attorney's fees. That appeal is pending.

suspension constituted unlawful discrimination based on race and religion by an entity receiving federal funds. As to the City, Plaintiff seeks monetary damages based on the City of Irving police officers' alleged violations of A.M.'s constitutionally protected rights under the Fourth and Fifth Amendments in connection with his interrogation and arrest. In addition to alleging that an historical pattern of discrimination by the City of Irving Police Department led to the A.M.'s unlawful interrogation and arrest, Plaintiff contends that the City is liable for Fourth Amendment violations based on its failure train and supervise its officers with respect to determining probable cause for arrest, that the inadequate training caused the alleged constitutional violations, and that the City's policymakers were deliberately indifferent to the need for additional training. Plaintiff asserts that Defendants are jointly and severally liable and, in addition to actual and compensatory damages, seeks declaratory and injunctive relief, exemplary damages, attorney's fees, and costs.

All Defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The motions have been fully briefed and are ripe for adjudication.

## II.   Applicable Legal Standard

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier,* 509 F.3d at 675; *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp*., 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker*

*Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

## III.  Analysis

### A.  Section 1983 Claims

Title 42 U.S.C. § 1983 provides a civil remedy in federal court for violations, under color of state law, of the rights, privileges and immunities secured by the Constitution and laws of the United

States.  *Findeisen v. N.E. Indep. Sch. Dist.*, 749 F.2d 234, 236-37 (5th Cir. 1984).[4]  It is well-established that school administrators, such as principals, are state actors for purposes of section 1983.  *See, e.g., Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521 (5th Cir. 1994) (DISD school principal treated as state actor by court).  To state a claim under section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person or entity acting under color of state law.  *See Atteberry v. Nocona Gen. Hosp.,* 430 F.3d 245, 252-53 (5th Cir. 2005) (citations omitted); *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998) (citations omitted).

All Defendants move to dismiss Plaintiff's section 1983 claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The IISD argues that Plaintiff fails to allege conduct actionable against it pursuant to 42 U.S.C. § 1983.  The City contends that "Plaintiff[] fail[s] to allege sufficient facts to state facially plausible claims for municipal liability under Section 1983, both because Plaintiff[] failed to allege facts sufficient to establish any underlying constitutional violation and because Plaintiff[] fail[s] to establish a policy, custom, or practice of the City which caused any constitutional violations."  *See* Def. City of Irving's Mot. to Dismiss (Doc. 8).  The City also argues that dismissal is warranted because Plaintiff fails to allege facts sufficient to meet the elements of their causes of action against the City.  Principal Cummings asserts he is entitled to qualified immunity, as Plaintiff has failed to plead facts showing that he violated any of A.M.'s clearly established constitutional

---

[4] Section 1983 provides in part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

rights. The court will address the IISD's and the City's arguments in support of dismissal together, as they are both governmental entities for purposes of the court's section 1983 analysis.

### 1. Section 1983 Claims Against the IISD and the City

A governmental entity, such as the IISD or the City, can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Parties can sue a municipality that has violated their constitutional rights 'under color of any statute, ordinance, regulation, custom, or usage.'" *Advanced Tech. Bldg. Solutions, L.L.C. v. City of Jackson*, 817 F.3d 163, 165 (5th Cir. 2016) (quoting 42 U.S.C. § 1983 and citing *Monell*, 436 U.S. at 690). As governmental entities, the IISD and the City *cannot* be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Monell*, 436 U.S. at 691; *see also Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 380 (5th Cir. 2007) ("A school district has no vicarious liability under § 1983."); *Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979) (recognizing that "state vicarious liability doctrines are inapplicable in [section] 1983 suits.").

Official policy is defined as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [school district or city] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of [school district or city] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [school district or city] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the [school district or city] or to an official to whom that body had delegated policy-making authority.

*Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1304 (5th Cir. 1995); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*) (per curiam); *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*) (per curiam). To hold a municipality liable under 42 U.S.C. § 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc).[5]

Regardless of the required proof needed to prevail ultimately on a given claim, to survive a motion to dismiss, claims within the live pleading must contain sufficient factual allegations to satisfy Federal Rule of Civil Procedure 8(a)(2), as interpreted in *Iqbal*, *supra*, and *Twombly*, *supra*. When ruling on a Rule 12(b)(6) motion, a court must examine the factual allegations of the live pleading to determine whether asserted claims survive the motion. *See Groden v. City of Dallas*, 826 F.3d 280, 282-83 (5th Cir. 2016). In *Groden*, the Fifth Circuit clarified that to state a claim upon which relief can be granted, "a plaintiff is not required to single out the specific policymaker in his complaint." *Id.* at 282. To sufficiently state a claim upon which relief can be granted to survive a motion to dismiss,

> [a plaintiff need] only to plead facts—facts which establish that [a] challenged policy was promulgated or ratified by the city's policymaker. [The] complaint [does] not need to supply an answer to the *legal* question of the specific identity of the city's policymaker under the relevant statutory scheme.

---

[5] Liability must rest on official policy, meaning the governmental entity's policy, and not the policy of an individual official. *Bennett*, 728 F.2d at 769. The official complained of must possess

> final authority to establish [school district or city] policy with respect to the action ordered. . . .The official must also be responsible for establishing final government policy respecting such activity before the [school district or city] can be held liable. . . . [W]hether an official had final policymaking authority is a question of state law.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986).

*Id.* at 285 (original emphasis).  *Groden* involved a claim against the City of Dallas for a "crackdown policy" of arresting vendors without probable cause "in retaliation for annoying-but-protected speech" in Dealey Plaza.  *Id.* at 286.  Because the plaintiff alleged that the city's official spokesman publically announced the new policy of cracking down on vendors in Dealey Plaza and gave media interviews describing the new policy, the Fifth Circuit found that the plaintiff had sufficiently pleaded promulgation or ratification by a policymaker even though he had not specifically identified one.  *See id.* at 286.

Even though the operative pleading need not "supply an answer to the legal question of the specific identity of the city's policymaker under the relevant statutory scheme," which Plaintiff can determine in discovery, he needs to plead some "facts [that] establish that the challenged policy was promulgated or ratified by the city's policymaker," whoever that is.  *Id.* at 285.

a.   *Fourteenth Amendment Equal Protection Claim Against the IISD*

The Fourteenth Amendment provides in pertinent part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.  The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons be treated alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Plyler v. Doe*, 457 U.S. 202, 216 (1983).  Plaintiff's section 1983 claim based on the Equal Protection Clause of the Fourteenth Amendment requires allegations of discriminatory intent or purpose based on race or religion, or allegations from which the court can reasonably infer a discriminatory intent or purpose based on race or religion.  *See Washington v. Davis*, 426 U.S. 229,

242 (1976); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

First, other than wholesale conclusory and speculative statements, Plaintiff does not allege any facts from which this court can reasonably infer that any IISD employee intentionally discriminated against A.M. based on his race or religion. Plaintiff does not allege that the IISD treated A.M. differently because of his race or religion than other students involved in similar disciplinary situations. Absent allegations of intentional discrimination, or allegations from which the court can reasonably infer intentional discrimination, Plaintiff fails to allege an equal protection violation against the IISD. *See Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) ("[T]o state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race.") (citations omitted).

Alternatively, Plaintiff fails to allege adequately facts to support liability against the IISD under section 1983. Plaintiff does not allege that the IISD's Board of Trustees maintained an unconstitutional policy of discriminatory discipline based on race or religion. The sole allegation in the Complaint is that a "pattern of discrimination" in the IISD, as shown by student discipline statistics allegedly compiled by the TEA, "led directly" to the "over-discipline of [A.M.] for showing off his home-made clock-in-a-pencil-box to his teachers." Compl. ¶ 77. The law is clear that "the description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Birabil v. Martinez*, 2016 WL 4402259, at *5 (N.D. Tex. July 11, 2016) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)) (report and recommendation adopted, 2016 WL 4411412 (N.D. Tex. Aug. 18, 2016)). In

*Spiller*, the Fifth Circuit found the allegation that several policies "led to" unspecified "unconstitutional arrests and confinements," and that a departmental policy of "engag[ing] in conduct toward African American citizens without regard to probable cause to arrest" were too vague and conclusory to support alleged municipal liability under *Monell*. 130 F.3d at 167. Plaintiff's allegations fail for the same reason.

Further, allegations regarding findings of disparate discipline in TEA reports and an alleged anti-Muslim bias in the community are not "facts [that] establish that the challenged policy was promulgated or ratified by the [school district's] policymaker," in this case the Board of Trustees. *See Groden*, 826 F.3d at 285.[6]

Absent allegations from which the court can reasonably infer that A.M. was subject to unequal disciplinary treatment based on his religion or race, and absent adequate allegations to state a plausible section 1983 claim against the IISD based on a policy or custom that led to a constitutional deprivation, the court determines that Plaintiff's section 1983 equal protection claim against the IISD should be dismissed for failure to state a claim.

### b. *Fourth and Fifth Amendment Claims Against the City*

### i. *Fourth Amendment*

Plaintiff alleges that City of Irving police officers violated A.M.'s Fourth Amendment rights when they allegedly arrested him without probable cause. Compl. ¶ 85. Plaintiff does not sue any of the police officers allegedly involved but only the City. The City argues that Plaintiff's claim of

---

[6]Under Texas law, the final policymaking authority in an independent school district rests with the district's trustees. *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993). Texas Education Code § 11.051(a)(1) provides: "An independent school district is governed by a board of trustees who, as a body corporate, shall[] oversee the management of the district[.]" The Texas Education Code further provides, "[T]he trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district," and that "[T]he trustees may adopt rules and bylaws necessary to carry out the[ir] powers and duties[.]" *Id.* § 11.151(b) and (d).

a Fourth Amendment violation should be dismissed because "Plaintiff ha[s] not pled sufficient facts to establish either a constitutional violation by the City or a policy, custom, or practice of the City that was the moving force of a constitutional violation." City Mot. to Dismiss 15 (Doc. 8) (citing *Monell*, 436 U.S. at 694). The court agrees that, even assuming, *arguendo*, that the City of Irving police officers violated A.M.'s Fourth Amendment right to be from arrest without probable cause, Plaintiff fails to allege a policy, custom, or practice of the City that was the moving force of an alleged constitutional violation. As already stated, the City *cannot* be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Monell*, 436 U.S. at 691.

First, Plaintiff fails to identify any official policy that allegedly caused the underlying constitutional violation. In the absence of an officially promulgated policy, Plaintiff must allege a constitutional deprivation that was more than an isolated incident but was caused by a practice that was sufficiently widespread to constitute a custom having the force of law. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Plaintiff has not made these allegations. Accordingly, the court is left with an isolated, allegedly unconstitutional incident, which is generally insufficient to establish an official policy or custom for section 1983 purposes. *See Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008); *Petrie v. City of Grapevine*, 904 F. Supp. 2d 569, 586 (N.D. Tex. 2012) (Lynn, J.), *aff'd sub nom. Petrie v. Salame*, 546 F. App'x 445 (5th Cir. 2013).[7]

Rather than pleading a custom or policy, Plaintiff alleges that the City participated in the CAP program that he asserts led to A.M.'s unconstitutional arrest. As the City points out: "Plaintiff offer[s] no well-pleaded allegation that the City was participating in CAP at the time of A.M.'s arrest

---

[7] "[A] single unconstitutional action by a municipal actor nay give rise to municipal liability if that actor is a final policymaker." *Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 548 (5th Cir. 2008) (citation omitted). In this case, however, Principal Cummings is not a final policymaker under state law. *See supra* note 6.

or that the arrest of a U.S. citizen, [A.M.], was connected in any way with a program designed to target criminal aliens." City's Reply 6 (Doc. 18). Quite simply, the court is unable to connect participation by the City in CAP, a program the Complaint alleges was supervised by DHS and designed to target criminal aliens, with the police officers' arrest of A.M., a United States citizen, or the contention that the arrest was made without probable cause.[8]

As an alternative basis for a section 1983 claim against the City, Plaintiff makes the conclusory allegation that the Irving Police Department failed to properly train and supervise its officers with respect to determining probable cause for arrest. *See* Compl. ¶¶ 88-91. Plaintiff, however, fails to allege how the City's training policy on probable cause was inadequate. Rather, Plaintiff relies on the conclusory allegation that "Irving police officers engaged in a pattern of unconstitutional detentions/arrests at least as far back as 2006." *Id.* ¶ 88. Plaintiff also makes the conclusory allegation that, at some unknown time in the past, the City's police chief allegedly acknowledged a pattern of unconstitutional detentions and arrests. *Id.* These conclusory allegations are inadequate to support a failure to train claim. There are no allegations concerning what type of training was being provided to the Irving police officers at or near the time A.M. was arrested, or any allegations as to how the training was defective. Absent such allegations, the Complaint fails to state a section 1983 claim for failure to train. *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010) (For liability to attach based on an inadequate training program, a plaintiff must allege with specificity how a particular training program of a city is defective.) (citation omitted).[9]

---

[8] The court similarly fails to understand the connection between reports from Berkeley Law School regarding race and ethnicity, and any allegation that a policy or custom of the City was the moving force behind A.M.'s arrest.

[9] Although the Complaint alleges a failure-to-supervise claim against the City, Plaintiff fails to address the City's motion to dismiss this claim in his response brief. As such, the court concludes that Plaintiff has conceded that he has failed to state a claim for failure to supervise against the City or, alternatively, by not addressing this claim, Plaintiff has

As Plaintiff has failed to allege any other custom, policy, or practice that was the moving force behind A.M.'s allegedly unconstitutional arrest in violation of the Fourth Amendment, or to adequately allege the elements of a failure to train claim, the court will dismiss Plaintiff's Fourth Amendment claim against the City.

ii.     *Fifth Amendment*

Plaintiff contends that City of Irving police officers violated A.M.'s Fifth Amendment rights when they allegedly refused his request to speak to his parents and allegedly failed to give him *Miranda* warnings. Compl. ¶¶ 90-91. The City argues that Plaintiff's claim of a Fifth Amendment violation should be dismissed because Plaintiff has failed to allege a constitutional violation.

The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. A plaintiff cannot maintain a section 1983 case for damages for a violation of the Fifth Amendment when the information allegedly improperly obtained was never actually used against him in a criminal case. *See Chavez v. Martinez*, 538 U.S. 760, 765-73 (2003). As the Supreme Court stated in *Chavez*, "[M]ere coercion does not violate the Self-Incrimination Clause absent use of the compelled statements in a criminal case against a witness." *Id.* at 769. "The Fifth Amendment privilege against self-incrimination is a fundamental trial right [that] can be violated only *at* trial, even though pre-trial conduct by law enforcement officials may ultimately impair that right." *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2008) (original emphasis); *see also Moore v. City of Grand Prairie*, 2013 WL 3146780, at *7 (N.D. Tex. June 20, 2013) (McBryde, J.) ("As the Court in *Chavez* made clear, an individual who is never prosecuted for a crime nor compelled to be a

---

abandoned it. Accordingly, this claim will be dismissed.

witness against herself in a criminal case cannot allege a violation of the Fifth Amendment's protection against self incrimination.").  In response, Plaintiff urges the court to disregard the law of the Fifth Circuit and to rely instead on "more recent decisions from other circuits [finding] that the use of unwarned statements at trial is not necessary for a plaintiff to state a claim for violation of his or her rights under the Fifth Amendment."  Pl.'s Resp. 18 (citing cases) (Doc. 15).

The court is bound by the law of the Fifth Circuit and declines Plaintiff's invitation to ignore binding precedent and look to case decisions from other circuit courts.  Here, Plaintiff has pleaded that all charges against A.M. arising from the arrest were dropped.  *See* Compl. ¶¶ 57, 68.  Plaintiff does not allege that any information allegedly improperly obtained from A.M. was ever used against him in a criminal trial or in pretrial proceedings.  For this reason, the court determines Plaintiff has failed to state a claim under the Fifth Amendment against the City.

In any event, although not addressed by any of the parties, the Fifth Circuit has held, as a matter of law, that: "The reading of *Miranda* warnings is a procedural safeguard rather than a right arising out of the [F]ifth [A]mendment itself . . . . Thus, the remedy for a *Miranda* violation is the exclusion from evidence of any compelled self[-]incrimination, not a section 1983 action[.]" *Hernandez v. Metro Transit Auth.*, 226 F.3d 643 (Table), 2000 WL 1029143, at *1 (5th Cir. July 12, 2000) (quoting with approval *Warren v. City of Lincoln, Neb.*, 864 F.2d 1436, 1442 (8th Cir. 1989)); *see also Rollerson v. City of Freeport, Tex.*, 2013 WL 2189892, at *14 (S.D. Tex. May 16, 2013), *aff'd*, 555 F. App'x 404 (5th Cir. 2014) (collecting cases holding that the remedy for a *Miranda* violation is exclusion from evidence of any compelled self-incrimination, not a section 1983 action).

Finally, the Complaint fails to identify any policy, custom, or practice of the City that was allegedly the moving force behind any violation of A.M.'s Fifth Amendment rights.[10]  As such, dismissal is warranted on this basis as well.

## 2. Section 1983 Claim Against Principal Cummings

Defendant Principal Cummings contends that the court should dismiss Plaintiff's section 1983 claim against him because Plaintiff has failed to allege sufficient facts to defeat his qualified immunity defense. The court agrees.

### a. *Qualified Immunity*

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A defendant official must affirmatively plead the defense of qualified immunity.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  Defendant Principal Cummings has asserted this defense in his Motion to Dismiss.

In deciding a dispositive motion that raises the defense of qualified immunity, the Supreme Court initially set forth a mandatory two-part inquiry for determining whether a government official was entitled to qualified immunity.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under *Saucier*, a

---

[10] The Complaint does not allege a failure-to-train claim as a theory of liability with respect to Plaintiff's Fifth Amendment claims.  The court rejects Plaintiff's attempt to introduce this theory for the first time in his response to the City's Motion to Dismiss. "Review of a Rule 12(b)(6) dismissal is, by its very nature, limited to the allegations and theories set forth in the complaint that the district court had before it when granting the motion to dismiss." *Law v. Ocwen Loan Servicing, L.L.C.*, 587 F. App'x 790, 793 (5th Cir. 2014) (unpublished); *Powell v. Dallas Morning News LP*, 610 F. Supp. 2d 569, 577 (N.D. Tex. 2009) (In ruling on a motion to dismiss, statements and allegations in a response brief not contained in the complaint are not properly before the court.); *see also Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.") (citation omitted).

court must determine first whether the facts alleged or shown are sufficient to make out a violation

of a constitutional or federal statutory right. If the record sets forth or establishes no violation, no

further inquiry is necessary. On the other hand, if the plaintiff sufficiently pleads or establishes that

a violation could be made out, the court must determine whether the right at issue was clearly

established at the time of the government official's alleged misconduct. *Id.* The Court relaxed this

mandatory sequence in *Pearson v. Callahan*, 555 U.S. 223 (2009), and stated, "[W]hile the sequence

set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory," and judges

"should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances in the particular

case at hand." *Id.* at 236. The second prong of the test "is better understood as two separate

inquiries: whether the allegedly violated constitutional right[] [was] clearly established at the time

of the incident; and if so, whether the conduct of the defendant[] [official] was objectively

unreasonable in light of then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750

(5th Cir. 2005) (internal quotation marks and citations omitted); *see also Evans v. Ball*, 168 F.3d

856, 860 (5th Cir. 1999); *Hare v. City of Corinth,* 135 F.3d 320, 326 (5th Cir. 1998); *Eugene v. Alief

Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995).

Ordinarily, one who pleads an affirmative defense must establish his entitlement to such

defense. In the context of qualified immunity, however, this burden varies from the norm. In this

circuit, the rule is as follows:

> Where . . . [a] defendant pleads qualified immunity and shows he is a governmental
> official whose position involves the exercise of discretion, the plaintiff then has the
> burden to rebut this defense by establishing that the official's allegedly wrongful
> conduct violated clearly established law. We do not require that an official
> demonstrate that he did not violate clearly established federal rights; our precedent
> places that burden upon plaintiffs.

*Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (internal quotations and citations omitted); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. at 640; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998); and *Pierce v. Smith*, 117 F.3d at 871.

In *Anderson*, 483 U.S. at 641, the Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster*, 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640. For

an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Pierce v. Smith*, 117 F.3d at 882 (emphasis in original and citation omitted); and *Stefanoff v. Hays County*, 154 F.3d at 525. Stated differently, while the law does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted).

In analyzing qualified immunity claims, the Supreme Court has "repeatedly told courts … to not define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). Pursuant to *Mullenix*, courts must consider "whether the violative nature of *particular* conduct is clearly established" and must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotations marks omitted).

To defeat or overcome an official's qualified immunity defense, a plaintiff's complaint must allege specific facts that, if proved, would show that the official's conduct violated clearly established constitutional or statutory rights. In cases involving claims of qualified immunity, often it is appropriate to require a plaintiff to file a detailed reply to address the plea of qualified immunity. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc). "[T]he reply must be tailored to the assertion of qualified immunity and fairly engage its allegations. A defendant has an incentive to plead his defense with some particularity because it has the practical effect of requiring particularity in the reply." *Id.* A plaintiff generally must be given the opportunity to reply with

greater specificity in such cases before the court rules on a defendant's dispositive motion. *Todd v. Hawk*, 72 F.3d 443, 446 (5th Cir. 1996).

A reply, however, is only required when the claims in the complaint are not supported "with sufficient precision and factual specificity to raise a genuine issue as to the illegality of [a] defendant's conduct at the time of the alleged acts." *Schultea*, 47 F.3d at 1434. If "the pleadings on their face show an unreasonable violation of a clearly established constitutional right," the assertion of a qualified immunity defense is insufficient to sustain a Rule 12(b)(6) motion to dismiss. *Shipp v. McMahon,* 234 F.3d 907, 912 (5th Cir. 2000), *overruled in part on other grounds by McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc).

### b. Discussion

The threshold question that the court must decide is whether, viewed in the light most favorable to Plaintiff, the Complaint sufficiently alleges that Principal Cummings violated A.M.'s constitutional right to equal protection of the laws under the Fourteenth Amendment. If the allegations fail to state a claim for an underlying constitutional violation, Principal Cummings is entitled to qualified immunity without the necessity that the court reach the other aspects of the qualified immunity inquiry.

Plaintiff seeks to allege a Fourteenth Amendment claim under the equal protection clause on the basis that Principal Cummings allegedly "violat[ed] [A.M.'s] clearly established constitutional right to be free from discriminatory discipline." Compl. ¶ 81. According to the Complaint, "[a]t the time [A.M.] was detained by Principal Cummings and the Irving Police Department, Principal Cummings was aware of the TEA's reports reflecting the disparity in discipline of African American students that was ongoing in the IISD." *Id.* ¶ 82. The Complaint further alleges that "[a]t the time

that Cummings engaged in such violations of law, he was aware of all of the facts that would inform a reasonable principal that there was no conduct meriting discipline—much less police intervention. He was aware the clock was not a bomb." *Id.* ¶ 83. The Complaint alleges that Principal Cummings "knowingly violated the Fourteenth Amendment and the rights of [A.M.]" when he interrogated A.M., threatened him with expulsion if he did not sign a statement, and suspended him for three days. *Id.* ¶ 84.

"[T]o state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege that [(1) he or she] received treatment different from that received by similarly situated individuals and that [(2)] the unequal treatment stemmed from a discriminatory intent.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (quoting *Priester v. Lowndes Cty.,* 354 F.3d 414, 424 (5th Cir.2004) (in turn quoting *Taylor v. Johnson,* 257 F.3d 470, 473 (5th Cir. 2001)).[11] Discriminatory intent means "that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Fennell*, 804 F.3d at 412 (quoting *Taylor,* 257 F.3d at 473). "Allegations [of discriminatory intent] that are merely conclusory, without reference to specific facts, will not suffice." *Id.* (quoting *Priester,* 354 F.3d at 420).

Viewing all well-pleaded allegations as true and drawing all reasonable inferences in favor of Plaintiff, the court determines that the Complaint fails to plead facts from which the court can reasonably infer that Principal Cummings's complained-of conduct was motivated by unlawful racial or religious animus. To the extent the Complaint alleges that Principal Cummings intentionally

---

[11] The same analysis applies with regard to Plaintiff's equal protection claim based on religion, as religion, like race, is a "suspect class." *See Sonnier v. Quarterman*, 476 F.3d 349, 368 n.17 (5th Cir. 2007).

discriminated against A.M. based on his race or religion, the allegations are wholly conclusory and fail to "raise a right to relief above the speculative level . . . [even] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *See Twombly*, 550 U.S. at 555; *see also* Compl. ¶ 84. The Complaint contains no factual allegation that supports a showing that Principal Cummings removed A.M. from the classroom, ordered him to write a statement, or decided to temporarily suspend him from McArthur, based on his religion or race. Plaintiff's reliance on nothing more than conclusory, speculative, and sweeping allegations of constitutional violations and intent is insufficient to overcome Principal Cummings's qualified immunity defense. *See Iqbal*, 556 U.S. at 676 (holding that a section 1983 plaintiff "must plead sufficient factual material" to show that the public servant took action "for the purpose of discrimination on account" of the plaintiff's protected status); *Fennell*, 804 F.3d at 412 ("[A]llegations [of discriminatory intent] that are merely conclusory, without reference to specific facts, will not suffice.") (citation omitted). In this case, as in *Iqbal,* the Complaint "does not contain any factual allegation sufficient to plausibly suggest [defendant's] discriminatory state of mind." *Iqbal,* 556 U.S. at 683.

Further, the Complaint fails to state an equal protection violation against Principal Cummings because it does not allege that he treated A.M. differently than other similarly situated students, and that the unequal treatment was based on religion or race. *See, e.g., Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F. Supp. 3d 681, 703 (N.D. Tex. 2014) (Fitzwater, J.) (dismissing equal protection claim when student did not identify another student who was treated more favorably); *Turner v. Houston Indep. Sch. Dist.*, 2013 WL 3353956, at *3 (S.D. Tex. July 13, 2013) (dismissing equal protection claim when plaintiff failed to identify any nondisabled student that was treated differently); *Broaders v. Polk Cty. Sch. Bd.*, 2011 WL 2610185, at *5 (M.D. Fla. Apr. 19, 2011) (dismissing equal

protection claim when student "failed to allege sufficient facts showing that Defendant's policies treat minority disabled students differently from other students").

In addition, the court rejects Plaintiff's attempt to base his equal protection claim on Principal Cummings's alleged violation of Chapter 52 of the Texas Family Code (titled "Proceedings Before and Including Referral to Court") based on his alleged failure to notify promptly A.M.'s parents that he was suspended. These allegations do not show disparate treatment or otherwise negate Principal Cummings's qualified immunity. "[A] violation of a state statute alone is not cognizable under § 1983 because § 1983 is only a remedy for violations of federal statutory and constitutional rights." *Woodard v. Andrus,* 419 F.3d 348, 353 (5th Cir. 2005). Further, Chapter 52 of the Family Code, upon which Plaintiff relies, applies to officials who take children in police custody. *See* Tex. Fam. Code § 52.02(b).[12] As Principal Cummings correctly notes, there is no allegation that he took A.M. into custody. The Complaint alleges that A.M. was removed from school by the City of Irving police and not by Principal Cummings. *See* Compl. ¶ 60. Finally, even were the Texas Family Code applicable to the alleged actions of Principal Cummings, the Complaint contains no allegations that any violation of the Family Code was motivated by religious or racial animus or that any delay in notifying A.M.'s parents of the suspension was based on impermissible discrimination based on religion or race.

Finally, allegations that the IISD has a pattern of disciplining African-American students more harshly than other students, that the IISD generally had an anti-Muslim bias, that Principal Cummings was aware of TEA reports reflecting such disparity, or that other school officials

---

[12] Section 52.02(b) provides, in relevant part: "A person taking a child into custody shall promptly give notice of the person's action and a statement of the reason for taking the child into custody, to: (1) the child's parent, guardian, or custodian." Tex. Fam. Code § 52.02(b).

displayed racial animus, are insufficient as a matter of law to impute liability to Principal Cummings. To overcome Principal Cummings's qualified immunity defense, Plaintiff must, at a minimum, allege facts from which the court may infer that Principal Cummings was *himself* personally motivated by discriminatory animus. *See Iqbal,* 556 U.S. at 676 ("[B]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own* individual actions, has violated the Constitution.") (emphasis added).

Even assuming that Plaintiff had met the threshold requirement of alleging an underlying constitutional violation, the court concludes that Principal Cummings is, nevertheless, entitled to qualified immunity because Plaintiff has failed to allege facts from which the court can conclude that Principal Cummings acted in an objectively unreasonable manner.

Principals are responsible for the safety of students and others on campus and, as part of that responsibility, often have to make decisions quickly and with little information. The court acknowledges that A.M. repeatedly stated that the device in question was an alarm clock and not a bomb; however, in light of well-documented incidents in this country of students bringing weapons and other prohibited devices to school, one in Principal Cummings's position cannot rely on or accept such assertions without at least conducting some level of investigation or sufficient inquiry to ensure that the device does not pose a risk to the safety of students and others on campus.

In this case, A.M. was ultimately arrested for the offense of a "hoax bomb." The statutory definition of a "hoax bomb" is a device that reasonably appears to be an explosive or incendiary device, or that, by its design, causes alarm or reaction of any type by an official of a public safety agency. Tex. Penal Code § 46.01(13). The Complaint alleges that A.M. brought a homemade contraption to school in an "8 ½" by 5" Vaultz pencil box" that included "a 7 segment display, a pcb

board, a 9 volt battery, some wires (from a media player that wasn't working), a 120-240 volt transformer, [and] a button board." Compl. ¶ 53. The Complaint further alleges A.M. showed the device to one of his teachers who advised him to keep it in his backpack. *Id.* ¶ 54. According to the Complaint, later that same day, notwithstanding the teacher's instruction, A.M. showed the device to another student during a class. *Id.* The Complaint alleges that the device made a beeping sound and caught the attention of his English teacher, Ms. West. *Id.* According to the Complaint, A.M. showed Ms. West the device after class, and she asked: "[I]s that a bomb?" *Id.* A.M. told her it was an alarm clock. *Id.* Ms. West confiscated the device from A.M., and it was held in the administrative offices of the school for several hours. *Id.*

This is not a situation in which a person standing in Principal Cummings's shoes can take unnecessary risks. It would have been fatuous or nonsensical for Principal Cummings to do nothing and wait for something to occur before acting. Further, Plaintiff implicitly assumes that Principal Cummings had some level of expertise and experience in dealing with bombs or explosives and thereby should have known the device was not a bomb but merely an alarm clock. By Plaintiff's own admission, his son disobeyed a teacher's instructions to keep the device in his backpack. Contrary to this admonition, A.M. showed the device to another student, and ultimately the device caught the attention of Ms. West.

Public officials are entitled to qualified immunity unless it is shown that their actions are objectively unreasonable. One may consider a three-day suspension imposed on A.M. to be harsh and unreasonable, but the court is not prepared to conclude that Principal Cummings's actions were objectively unreasonable based on the allegations of the Complaint. A principal's fate is not so hapless that, on the one hand, by not taking action he is faced with the gruesome prospect of death

or serious injury of persons had the device actually been a bomb and exploded; and, on the other hand, he is faced with a federal lawsuit for denial of a student's constitutional rights because the device turned out not to be a bomb. *Woe unto the principal who fails to act on a potential threat that later becomes a reality!* To hold Principal Cummings, or any other administrator, to this standard places him between the dreaded Scylla and Charybdis.[13]

As earlier stated, qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. Principal Cummings's alleged conduct falls into neither category. The court simply cannot go so far as to say, based on the allegations presented, that Principal Cummings was "plainly incompetent" or "knowingly violate[d] the law" or A.M.'s constitutional rights. Moreover, the Complaint contains no allegations from which the court can reasonably infer that Principal Cummings would have acted differently if the student bringing the device to school and showing it to others in violation of a teacher's orders had been non-African American or non-Islamic.

---

[13] As this court previously explained:

According to Greek mythology, Scylla was originally a beautiful nymph who was later turned into a monster by Circe, an enchantress. Glaucus, a sea god, fell in love with Scylla; however, she wanted no part of him. When Scylla rebuffed Glaucus's efforts to spark her, he enlisted the aid of Circe to persuade Scylla that she should love him. Circe, however, had ideas of her own and tried to convince Glaucus to love her instead of Scylla. When Glaucus spurned Circe's amorous efforts, she became enraged and turned Scylla into a monster to spite Glaucus.

After being turned into a monster, Scylla lived in a cave overlooking the Strait of Messina, which separates the island of Sicily from Italy. Immediately opposite the cave where Scylla lived was the whirlpool Charybdis. When mariners navigated the Strait of Messina, they were faced with the . . . repugnant alternatives of either (1) being devoured by Scylla, or (2) being sucked into and drowned by the deadly waters of the whirlpool Charybdis.

*Title v. Raines*, 231 F. Supp. 2d 537, 554 n.12 (N.D. Tex. 2002), *aff'd*, 69 F. App'x 658 (5th Cir. 2003).

For these reasons, the allegations in the Complaint regarding Principal Cummings are inadequate to overcome his defense of qualified immunity. Accordingly, the court will grant Principal Cummings's Motion to Dismiss based on qualified immunity.

**B.** **Title VI Claims**

Plaintiff seeks compensatory damages against the IISD under Title VI alleging that "ongoing discrimination" in the IISD on the basis of race and religion caused the purportedly unlawful discipline of A.M. on September 14, 2015. *See* Compl. ¶ 106. Defendant IISD moves to dismiss Plaintiff's Title VI claims, arguing that (1) religious discrimination claims are not actionable under Title VI, (2) it cannot be held vicariously liable with respect to race discrimination claims for alleged discrimination by administrators, and (3) Plaintiff fails to allege a plausible claim that the IISD had actual knowledge of discrimination against A.M. and responded with deliberate indifference. For the following reasons, the court concludes that Plaintiff fails to state a claim under Title VI against Defendant IISD.

Section 601 of Title VI provides in relevant part: "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Private individuals may sue to enforce section 601 of Title VI and obtain both monetary and injunctive relief. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). To state a claim for damages under Title VI, a private litigant must, among other things, "plead facts in support of intentional discrimination." *Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (per curiam) (citing *Sandoval*, 532 U.S. at 281); *see also Sandoval*, 532 U.S. at 280 ("'Title VI itself directly reach[es] only instances of intentional

discrimination.'") (quoting *Alexander v. Choate*, 469 U.S. 287, 293 (1985)). A complaint that does not set forth "specific allegations of acts that were taken with discriminatory intent" does not state a claim for Title VI violations. *Muthukumar v. Univ. of Tex. at Dallas*, 2010 WL 5287530, at *5 (N.D. Tex. Dec. 27, 2010) (Boyle, J.).

Under Title VI, like Title IX, in cases that do not involve an official policy, damages are not available unless an "appropriate person"—an official authorized to institute corrective measures—had "actual knowledge" of the discrimination and responded with "deliberate indifference." *Gesber v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).[14] In *Gesber*, the Court held that a Texas school district could not be held liable for damages based on a teacher's sexual molestation of a child because no one in authority knew of the molestation, and expressly rejected Title VI liability based on negligence, constructive notice, and respondeat superior. *Id.* at 285-88; *cf.* 42 U.S.C. § 2000d-1 (providing that no action shall be taken against a federal department or agency for violating Title VI until the department or agency concerned has advised the "appropriate person" of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means).

### a. Religious Discrimination

Title VI, on its face, does not prohibit religious discrimination. *See* 42 U.S.C. § 2000(d) (prohibiting discrimination "on the grounds of race, color, or national origin"). Further, lower courts may not recognize causes of action when "a statute has not created them." *Sandoval*, 502 U.S. at

---

[14] The Supreme Court is *Gesber* noted that Title IX was modeled after Title VI, which is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in educational programming." *Gesber*, 524 U.S. at 286. "The two statutes operate in the same manner conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Id.* Because Title VI and Title IX "operate in the same manner," *see id.*, case law interpreting Title IX is equally applicable to cases involving Title VI.

291. Accordingly, because Title VI does not proscribe discrimination based on religion, the court will dismiss Plaintiff's Title VI claim insofar as it is based on alleged religious discrimination.[15]

### b. Race Discrimination

In support of his Title VI claim, Plaintiff alleges that Principal Cummings discriminated against him based on race in connection with removing him from class, ordering him to write a statement, and imposing a three-day suspension. Plaintiff, however, fails to plead any facts suggesting that Principal Cummings treated him differently than other similarly situated students based on his race. Instead, Plaintiff advances only his subjective belief that Principal Cummings's actions were motivated by A.M.'s race. These bare allegations do not meet the *Iqbal* standard. *See Iqbal*, 556 U.S. at 678 (The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."). With respect to Ms. West, Plaintiff similarly fails to allege facts that she took any actions against A.M. based on race or treated A.M. differently than students in similar disciplinary situations based on his race.

Even had Plaintiff adequately alleged intentional discrimination based on race by Principal Cummings or Ms. West or any other school administrator, an entity such as IISD cannot be held vicariously liable under Title VI. *Gesber*, 524 U.S. at 285-88. Thus, insofar as Plaintiff bases his Title VI claim against the IISD on a theory of vicarious liability for Principal Cummings's or Ms. West's actions, dismissal is required. Further, there are no allegations that any "appropriate person" was aware of unlawful discrimination by Principal Cummings or any other school administrator and responded with "deliberate indifference." *Gesber*, 524 U.S. at 290; *see, e.g., Rubio v. Turner Unified*

---

[15] In addition, Plaintiff fails to address IISD's motion to dismiss the Title VI claim insofar as it is premised on religious discrimination in his response brief and, therefore, has abandoned this claim.

*Sch. Dist.*, 475 F. Supp. 2d 1092, 1099 (D. Kan. 2007) (holding that school district is not liable under Title VI for the actions of a principal who allegedly prohibited students from speaking Spanish because the school district did not know the principal had engaged in that behavior).

Moreover, Plaintiff places much emphasis on the TEA data allegedly showing racial disparity in student discipline in the IISD and on the report of Dr. Hines allegedly finding the presence of "dysconscious racism." *See* Compl. ¶¶ 15-28. Allegations pertaining to TEA data purportedly showing racial disparity in student discipline and Dr. Hines's report concluding that "dysconscious racism" was present, do not establish that IISD's leadership knew about intentional discrimination at McArthur or any specific unlawful disciplinary incident or practice. As the IISD correctly notes, "Plaintiff's reliance on raw disciplinary data ignores the fact that damages are only available for intentional discrimination." IISD's Mot. to Dismiss 10 (Doc. 10). Even were the TEA data and Dr. Hines's report interpreted to suggest a shortcoming in the disciplinary process, they are insufficient to demonstrate that the IISD had actual knowledge of, or acted with deliberate indifference to, the intentional discrimination alleged in the Complaint.

Finally, with respect to allegations of alleged racial discrimination or harassment at other schools A.M. attended prior to McArthur, the Complaint contains no allegations from which the court can infer that a school official with authority to take corrective action had "actual knowledge" of the harassment or discrimination and responded with "deliberate indifference." *Gesber*, 524 U.S. at 290. As already stated, a school district cannot be held vicariously liable for the allegedly discriminatory acts of its employees. *Id.* at 285-88.

Accordingly, the court concludes that Plaintiff fails to state a valid claim under Title VI against Defendant IISD for intentional discrimination based on race.

### C. Principal Cummings and the IISD's Request for a Stay of Discovery

Defendants Principal Cummings and the IISD contend that all discovery should be stayed because Plaintiff has not pleaded facts to overcome Principal Cummings's qualified immunity defense. As the court has dismissed all claims and is allowing Plaintiff an opportunity to amend as to those claims dismissed without prejudice, the court will deny as moot the Motion to Stay Discovery.

## IV. Conclusion

For the reasons herein stated, the court **grants** Defendant City of Irving's Motion to Dismiss (Doc. 8); **grants** Defendant Irving Independent School District's Motion to Dismiss and **denies as moot** its Motion to Strike (Doc. 10); **grants** Defendant Daniel Cummings's Motion to Dismiss and **denies as moot** his Motion to Strike (Doc. 11); and **denies as moot** Defendant Irving Independent School District and Daniel Cummings's Joint Motion to Stay Discovery Pending Resolution of Motions to Dismiss (Doc. 22).

The court **dismisses without prejudice** the following claims: Plaintiff's section 1983 claims against the IISD and Principal Cummings for alleged violations of A.M.'s right to equal protection under the Fourteenth Amendment; Plaintiff's Title VI claim against the IISD insofar as it is based on race discrimination; and Plaintiff's section 1983 claim against the City insofar as it is premised on alleged violations of the Fourth Amendment. The court also **dismisses without prejudice** Plaintiff's claim for joint and several liability, as Plaintiff has not offered any allegations addressing the elements of such a claim. The court **dismisses with prejudice** Plaintiff's Title VI claim against the IISD insofar as it is based on religious discrimination; and Plaintiff's section 1983 claim against the City insofar as it is premised on alleged violations of the Fifth Amendment.

The court believes, because of Supreme Court and Fifth Circuit precedent, that Plaintiff should be permitted an opportunity to amend his pleadings with respect to those allegations that are factually deficient. Accordingly, *as to those claims dismissed without prejudice*, Plaintiff is permitted to file an amended complaint on or before **Thursday, June 1, 2017.**[16] If Plaintiff fails to cure the pleading deficiencies identified by the court by this date, this action is subject to dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), or without prejudice pursuant to Federal Rule of Civil Procedure 41(b) for failure to comply with a court order. As to those claims dismissed with prejudice in this memorandum opinion and order, the court concludes that allowing amendment would be futile, as there is no legal basis for those claims.

It is so **ordered** this **18th day** of **May, 2017.**

Sam A. Lindsay
United States District Judge

---

[16] In addition to requesting an opportunity to replead, Plaintiff asks the court "for leave to file a Rule 7(a) Reply to the specific issue of qualified immunity[.]" Pl.'s Resp. to Defs.' Mot. to Stay Discovery 9 (Doc. 23). The court is allowing Plaintiff leave to amend his pleadings as to certain claims asserted against the City and the IISD. In the interest of judicial economy, to the extent Plaintiff decides to amend his pleadings against Principal Cummings tailored to his assertion of qualified immunity, Plaintiff shall do so in the amended complaint, rather than in a separate Rule 7(a) reply, as an amended pleading, if filed in accordance with the court's instructions, accomplishes the same objective. The court will consider Plaintiff's request for limited discovery only if it concludes the amended allegations are sufficient to defeat Principal Cummings's assertion of qualified immunity.