**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **MOHAMED ELHASSAN MOHAMED,** as next friend for A.M., a Minor, | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **Civil Action No. 3:16-cv-2283-L** |
| **IRVING INDEPENDENT SCHOOL DISTRICT, DANIEL CUMMINGS, in his individual capacity, CITY OF IRVING, ROBIN HOWMAN, CHARLES TAYLOR, JEFF MITCHELL, and OFFICER MILLER,** | § § § § § § § § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court are: Defendant City of Irving's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 35), filed June 6, 2017; Defendant Irving Independent School District's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 38), filed June 29, 2017; Defendant Daniel Cummings's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 39), filed June 29, 2017; Defendants Miller's and Mitchell's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 42), filed July 18, 2017; Defendant Taylor's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 49), filed September 6, 2017; and Defendant Howman's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 52), filed September 12, 2017.[1] Having considered the motions, responses, replies, pleadings, record, and applicable law,

---

[1] Defendants refer to Plaintiff in this case as "Plaintiffs." In the Second Amended Complaint, the caption states that Mohamed ElHassan Mohamed is bringing this action "as next friend for A.M., a minor,"

the court **grants** Defendant City of Irving's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 35); **grants** Defendant Irving Independent School District's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 38); **grants** Defendant Daniel Cummings's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 39); **grants** Defendants Miller's and Mitchell's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 42); **grants** Defendant Taylor's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 49); and **grants** Defendant Howman's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 52).

## I.  Background

This civil rights action stems from the September 14, 2015 suspension and arrest of A.M., a fourteen-year-old African-American Muslim freshman attending McArthur High School ("McArthur") in Irving, Texas.  He was suspended from school and arrested on charges of bringing a "hoax bomb" to school.  Mohamed Elhassan Mohamed ("Mr. Mohamed" or "Plaintiff"), as next friend for his minor son, A.M., filed this action on August 8, 2016, seeking monetary and injunctive relief against the City of Irving (the "City"), the Irving Independent School District (the "IISD"), and school principal Daniel Cummings ("Principal Cummings").  Mr. Mohamed alleged that Principal Cummings subjected A.M. to discriminatory discipline based on race and religion when he suspended A.M. for three days and, pursuant to 42 U.S.C. § 1983, sued him for alleged violations of A.M.'s constitutionally protected right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.  Alleging that Principal Cummings was acting pursuant to an unconstitutional practice of discriminatory discipline against African-American

---

and not on behalf of himself individually; thus, there is only one plaintiff.  The court, however, in the interest of judicial economy, has not gone through the painstaking process of correcting the error as reflected in the titles of the various motions listed.

students sanctioned by the IISD's Board of Trustees, Mr. Mohamed also sued the IISD for Fourteenth Amendment violations as well for allegedly violating Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), by discriminating against A.M. on the basis of his race and religion. Although Mr. Mohamed did not sue any of the individual police officers involved in A.M.'s arrest, he sued the City under section 1983 alleging that it had failed to properly train and supervise its officers with respect to determining probable cause for arrest, and that these inadequacies caused the police officers' alleged violations of A.M.'s constitutionally protected rights under the Fourth and Fifth Amendments to the United States Constitution.

On May 18, 2017, the court issued a memorandum opinion and order granting the City's, Principal Cummings's, and the IISD's respective motions to dismiss, and dismissed all claims without prejudice, with the exception of Mr. Mohamed's section 1983 claim against the City premised on alleged violations of the Fifth Amendment and his Title VI against the IISD premised on religious discrimination, which were dismissed with prejudice, "as there [was] no legal basis for those claims." *Mohamed v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 629 (N.D. Tex. 2017) ("*Mohamed I*"). The court granted Mr. Mohamed leave to file an amended pleading by June 1, 2017, as to all claims dismissed without prejudice. *Id.*

On June 1, 2017, Mr. Mohamed filed Plaintiff's First Amended Original Complaint (Doc. 27), and on June 15, 2017, the court granted Mr. Mohamed's motion for leave to file a Second Amended Complaint and to add as Defendants four City of Irving police officers: Robin Howman ("Officer Howman") and Charles Taylor ("Officer Taylor"), who were working as school resource officers at McArthur on the date of the incident; and Sergeant Richie Miller ("Sgt. Miller") and Sergeant Jeff Mitchell ("Sgt. Mitchell"), both of whom ultimately made the decision to arrest A.M.

On June 15, 2017, Mr. Mohamed, as next friend of A.M., filed Plaintiff's Second Amended Complaint ("Second Amended Complaint"), the live pleading. *See* Sec. Am. Compl. (Doc. 34). In addition to amending his pleadings in an attempt to overcome the pleading deficiencies identified by the court in *Mohamed I* with respect to his claims against the City, the IISD, and Principal Cummings, Mr. Mohamed brings claims against Officer Howman, Officer Taylor, Sgt. Miller, and Sgt. Mitchell (sometimes collectively, the "Officer Defendants") pursuant to section 1983, alleging that they violated the Fourth Amendment to the United States Constitution by arresting A.M. without probable cause on charges of bringing a "hoax bomb" to school in violation of section 46.08 of the Texas Penal Code and by using excessive force against him during the arrest. Mr. Mohamed asserts that Defendants are jointly and severally liable and, in addition to actual and compensatory damages, seeks declaratory and injunctive relief, exemplary damages, attorney's fees, and costs.

All Defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The City and the IISD contend that, although permitted an opportunity to amend his pleadings twice, Mr. Mohamed has failed to cure the pleading deficiencies noted by the court in *Mohamed I* and that his additional allegations are conclusory and insufficient to state a claim. Principal Cummings similarly argues that the amended pleadings are insufficient to overcome his entitlement to qualified immunity. The City, the IISD, and Principal Cummings request that all claims be dismissed with prejudice, as Mr. Mohamed has already had two previous opportunities to amend.

Sgt. Miller and Sgt. Mitchell, who were not parties in *Mohamed I*, assert their entitlement to qualified immunity and contend that Mr. Mohamed's section 1983 claim against them for unlawful arrest and excessive force in violation of the Fourth Amendment must be dismissed

because he fails to allege any underlying Fourth Amendment violation and because they did not violate clearly established law of which a reasonable law enforcement officer would have known. Officers Taylor and Howman also assert their entitlement to qualified immunity and make similar arguments to those made by Sgt. Miller and Sgt. Mitchell. In addition, Officers Taylor and Howman contend that dismissal is required on the face of the pleadings, as Mr. Mohamed alleges that it was Sgt. Miller and Sgt. Mitchell who made the decision to arrest A.M. and who used force against A.M., rather than either of them, thereby defeating any Fourth Amendment claim against them for arrest without probable cause or excessive force.

Mr. Mohamed counters that the allegations in the Second Amended Complaint are factually and legally sufficient to withstand a Rule 12(b)(6) motion to dismiss. He urges the court to deny the motions to dismiss.

The court now sets forth the allegations drawn from the Second Amended Complaint. In its recitation of the facts, the court applies the legal standard set forth in Section II of this Memorandum Opinion and Order and accepts all well-pleaded facts as true and views them in the light most favorable to Mr. Mohamed. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

**A.    Allegations Relating to September 14, 2015 Arrest and Suspension of A.M.**

On September 14, 2015, A.M., then a 14-year-old freshman, brought a homemade device to school in an "8 ½" by 5" Vaultz pencil box" that included "a 7 segment display, a pcb board, a 9 volt battery, some wires (from a media player that wasn't working), a 120-240 volt transformer, [and] a button board." Sec. Am. Compl. ¶ 57. A.M. showed the device to his Geometry teacher, Mr. Lemons, who told him that it was "really nice" and advised him to keep it in his backpack. *Id.* ¶ 58.

Later that same day, notwithstanding Mr. Lemon's instruction, A.M. removed the device from his backpack and showed it to another student during his fourth period English class. *Id.* The device made a beeping sound and caught the attention of his English teacher, Erin West ("Ms. West"). *Id.* Ms. West heard the beeping noise but did not know whence it came. *Id.* After class, A.M. approached Ms. West with the device and reminded her that the prior Friday he had told her he was going to build her something that weekend and bring it to school to show her. *Id.* When A.M. showed her the device, she asked: "[I]s that a bomb?" *Id.* A.M. was surprised and confused by her question, since he had built many contraptions over the years and taken them to school to show teachers, and he replied, "no, it's an alarm clock, see?" *Id.* Ms. West took the device from A.M., told him she would give it back to him at the end of the day, and placed it in her desk. *Id.* "For the next several hours, the homemade clock was out of A.M.'s hands." *Id.* Notwithstanding that McArthur had a bomb threat protocol, Ms. West did nothing to engage the protocol. *Id.* ¶ 59. "There was no alarm raised, no evacuation, [and] no bomb squad called." *Id. ¶ 58.* A few weeks later, a person called in a bomb threat and the entire school was evacuated in accordance with the emergency protocol. *Id.* ¶ 59.

Ms. West continued to conduct her classes. *Id.* ¶ 60. At 12:45 p.m., Ms. West sent an e-mail to Officer Howman stating: "I confiscated something from a student in my classroom that I would like for you or Officer Taylor to take a look at. I can't come down until 8th period. Is there a way for one of you to stop by Room (804) before this." *See* Joint App. in Supp. of Daniel Cummings's and IISD's Mot. to Dismiss Pl.'s Sec. Am. Compl. ("Joint App.") at Ex. A (September 14, 2015 e-

mail) (Doc. 40 at 2).[2]  Officer Howman told Ms. West that he would come to her room after he finished eating in ten to fifteen minutes.  Sec. Am. Compl. ¶ 60.  When Officer Howman arrived, Ms. West took the device into the hallway and plugged it into an electric socket on the wall to demonstrate the clock to Officer Howman.  *Id.*  Following this initial inspection, Officer Howman brought the device to the school resource office and showed it to Officer Taylor, who took a picture of the device and sent it to Sgt. Mitchell and Sgt. Miller.  *Id.*  After receiving the picture, Officers Miller and Mitchell drove to McArthur.  *Id.*

Several hours after Ms. West took the device from A.M., Principal Cummings and Officer Howman removed A.M. from his afternoon class and escorted him to a room where four more City police officers and school counselor, Ms. Wong, were waiting.  *Id.* ¶ 61.  When A.M. entered the room, Officer Taylor said, "Yep, that's who I thought it was."  *Id.*

The IISD Student Handbook provides, in pertinent part:

LAW ENFORCEMENT AGENCIES (All Grade Levels)
Questioning of Students
. . . .
- The principal will verify and record the identity of the officer or other authority and ask for an explanation of the need to question or interview the student at school.
- The principal ordinarily will make reasonable efforts to notify the parents unless the interviewer raises what the principal considers to be a valid objection.

*Id.* ¶ 62.

_____

[2] Mr. Mohamed references Ms. West's e-mail to Officer Howman in paragraph 60 of the Second Amended Complaint.  As the e-mail is referred to in the Complaint and central to the claims, the court may properly consider it for purposes of determining whether Mr. Mohamed has stated a claim.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.") (citation omitted).

According to the Second Amended Complaint:

> A.M. was interrogated for almost an hour and a half by the Irving police, despite his pleas for his parents. The Irving police, the Mayor of Irving and the IISD have all represented to the public that A.M. was "less than forthcoming" during his interrogation. However, A.M. repeatedly told them that it was an alarm clock, not a bomb, which was true. He repeatedly told them that he had made it to show his English teacher, which was true. The clock functioned as a crude alarm clock. A.M. never represented that it was anything else, he never made any threat of harm, he never said he had a bomb, and he never attempted to scare anyone or cause alarm. A.M. never misrepresented a single thing. Tellingly, the Irving police eventually dropped the charges for which they arrested him and it was stated that there was no proof that A.M. had "intent to cause alarm."

*Id.* ¶ 63.

When A.M. asked for his parents, he was told that he could not talk to them because he was in the middle of an interrogation. *Id.* ¶ 64. During the interrogation, Principal Cummings told A.M. to write a statement and "threatened to expel him if he did not." *Id.* ¶ 65. A.M. was "terrified" and did not want to write anything. *Id.* At 3:01 p.m., A.M. wrote on a piece of paper under the headingg "Write in your own words what happened": "I Built a clock, Cops think It's a Bomb." Joint App. 4, Declaration of Daniel Cummings at Ex. A (September 14, 2015 Statement) (Doc. 40-4).[3] Mr. Mohamed alleges that A.M. wrote the statement because he was threatened and did not have anything to hide, and that the reason he wrote "that he made an alarm clock and the authorities thought was a bomb" is because "that was what they were telling him." Sec. Am. Compl. ¶ 65. In the same Statement, at 3:02 p.m., Principal Cummings wrote: "I asked A.M. again, "What was your intent for building the clock? A.M. still will not tell me his intent for building a clock and bringing

---

[3] Mr. Mohamed references the September 14, 2015 Statement in paragraph 65 of the Second Amended Complaint. As the Statement is referred to in the Second Amended Complaint and central to Plaintiff's claims, the court may properly consider it for purposes of determining whether Mr. Mohamed has stated a claim. *See Collins*, 224 F.3d at 498-99.

it to school."  Joint App. 2.  "Near the end of the interrogation, [Sgt.] Miller told Officer Taylor to look in the penal code book for the components of making a bomb or a hoax bomb.  Officer Howman also pulled out his penal code book to assist in the search for a crime of which to charge A.M."  Sec. Am. Compl. ¶ 66.

Mr. Mohamed alleges that:

> Despite the fact that A.M. had told them about making the clock, despite the fact that they realized that it was, indeed, a crude alarm clock, despite th[e] fact that nobody—not one single person—alleged that A.M. had tried to scare them with it, had claimed it was a bomb or weapon or tried to cause alarm, despite the fact that nobody had cleared their classroom, called for emergency protocol or called in a bomb squad, [Sergeants] Miller and Mitchell made the decision to arrest A.M. for the offense of "hoax bomb."  At that point, [Sergeants] Mitchell and Miller pulled A.M. forcefully out of his chair, yanked his arms up behind his back so far that his right hand touched the back of his neck, causing a lot of pain.  Officer Howman placed A.M. in handcuffs and marched him out of the front of the school, all four officers involved in the arrest, two on each side of A.M.

*Id.* ¶ 67.  Mr. Mohamed further alleges that :

> Because Officer Howman was the arresting officer, A.M. was placed in the back of Officer Howman's police vehicle; however, when Officer Howman noticed that the mobile video was not working in his car, A.M. was transferred to Officer Taylor's police vehicle. They put him into the back of a police car. They took him to the police station and booked him as a criminal, with mugshots and fingerprinting—all still without his parents. On the way to the station, Officer Taylor told Officer Howman that [Sergeants] Mitchell and Miller wanted the device to show the captain, so Officer Howman gave the clock to [Sgt.] Miller when he arrived at the police station.
>
> When at the station, A.M. was seated in handcuffs in a room with Officers Taylor and Howman, who further questioned A.M. while [Sergeants] Mitchell and Miller inquired, presumably with their superiors, regarding how to proceed with the matter.  Eventually, [Sgt.] Miller returned to tell Officers Taylor and Howman that A.M. was going to be processed and released to his parents at the station.  Only at this point did Officer Howman called A.M.'s father, who indicated that he would be at the police station in 5 minutes. Around this time, Officer Taylor escorted A.M. to the juvenile division of the jail for processing.

*Id.* ¶¶ 69-70.  Mr. Mohamed contends:

A "hoax" is "something intended to deceive or defraud." A.M.'s Geometry teacher asked him what he had made and he said "an alarm clock." A.M.'s English teacher asked him what he had made and he said "an alarm clock." The principal and the police asked A.M. what he had made and he said "an alarm clock." There is no telling how many times that day A.M. explained that he had made "an alarm clock." There was not a single person who stated that A.M. had said anything "intended to deceive or defraud." As far as what the device looked like, the most telling thing so far (besides looking at it wherein it is incredibly obvious that it is not a bomb) is the Irving police internal email obtained through a FOIA request where the officer candidly chides the others and states, "That thing doesn't even look like a bomb." The pencil box is one that A.M. carried throughout the seventh grade without a problem. You can buy the same one right now on Amazon (Vaultz pencil box) for $14.99 (the one with Minions on it is a little more expensive).

*Id.* ¶ 71.

Thereafter, Mr. Mohamed arrived at the police station and, as he waited to see his son, Officer Howman came to speak with him and informed him that A.M. had been arrested for taking a "hoax bomb" to school and that he was still being processed and fingerprinted. *Id.* ¶ 72. Mr. Mohamed tried to explain to Officer Howman that A.M. was interested in robotics and created things, but she was unwilling to listen to his explanations. *Id.* Sgt. Mitchell then arrived on the scene and repeated to Mr. Mohamed that A.M. had been arrested for brining a "hoax bomb" to school, and was similarly unwilling to listen to his explanations. *Id.* ¶ 73. After A.M.'s mother and sister arrived, Mr. Mohamed asked whether they could see A.M. to find out what happened. *Id.* ¶ 74. Sgt. Mitchell said they could not see A.M. until the arrest was processed and completed. *Id.* Thereafter, Officer Taylor brought A.M. to his family in handcuffs, shoving A.M. as he walked and telling him to "hurry up." *Id.* After speaking with A.M., Mr. Mohamed urged the officers to drop all charges, stating that A.M. had done nothing wrong, but the officers refused to discuss this possibility. *Id.* ¶ 75.

As they were leaving, A.M.'s family asked for his electronic tablet back, which was refused. *Id.* ¶ 76. Sgt. Mitchell instructed them to leave the premises or risk having charges brought against them. *Id.*

Later that evening, Mr. Mohamed received an e-mail from Vice Principal Patrick Smith, stating that A.M. would be suspended from McArthur and all IISD properties for three days for violating the Student Code of Conduct by possessing prohibited items. *Id.* ¶ 77. A.M. alleges that he was not in possession of any items prohibited by the Student Code of Conduct. *Id.* All charges against A.M. were ultimately dropped, and the City's police chief admitted that the arrest of A.M. was a "mistake." *Id.*

The Second Amended Complaint alleges that the "United States Department of Justice has opened an investigation into the conduct of the [IISD], not just with respect to the treatment of [A.M.], but regarding its pattern of discrimination." *Id.* ¶ 78. It also alleges that a justice department official stated, "The Civil Rights Division has an investigation into the Irving School District regarding both harassment and the discipline of students on the basis of race, religion and national origin." *Id.* According to the Second Amended Complaint, that the investigation is ongoing. *Id.*

## B.    Allegations Relating to Racism in the IISD

According to the Second Amended Complaint, the IISD has an "ugly history of race struggles," and the State of Texas and the IISD have a "history of discrimination against Muslims in Texas curriculum and schools." *Id.* ¶ 13. In 2010, the Texas Board of Education adopted a state-wide social studies and history curriculum that amended or watered down teachings about the civil rights movement, religious freedom, and America's relationship with the United Nations, and also adopted a resolution that sought to limit references to Islam in textbooks, claiming the materials were

"pro-Islamic, Anti-Christian distortions." *Id.* ¶ 14. Data from the Texas Education Agency ("TEA") show racial disparities in student discipline in the IISD between 2007 and 2015. *Id.* ¶¶ 19-26.

In 2008, the IISD's then-Superintendent entered into a "Memorandum of Understanding" with the Irving Education Coalition in which the IISD agreed that it would have the data showing racial disparities in student discipline and allegations of discrimination based on race analyzed. *Id.* ¶ 27. The IISD hired Dr. Mack Hines ("Dr. Hines") "to provide professional development expertise to teachers on how to develop desired positive behavioral responses from African American students in the classroom." *Id.* ¶ 28. Dr. Hines conducted a study and created a report titled "The Skin They're In." *Id.* In the report, Dr. Hines "found that the most frequently cited area of racial disparity was school discipline practices[]" and that African-American students were "reprimanded differently and received suspensions more frequently." *Id.* ¶ 30. Dr. Hines concluded that the findings from his study pointed to "dysconscious racism," which is "knowingly or unknowingly discriminating against people because of race." *Id.* ¶ 32. In September 2011, the Board of Trustees met with Dr. Hines concerning his study and report and "reacted to the negative manner in which the report was received (particularly where it concluded there was an IISD 'race war' between Hispanics and African-Americans) by determining that Dr. Hines went beyond the scope of what he was hired to do, did not use proper methodologies and they declined to implement his recommendations to address the problems." *Id.* ¶ 34.

In 2011, Dr. Steven Jones ("Dr. Jones"), a white male, campaigned for election on the IISD Board of Trustees against Nancy Jones, an African-American female incumbent, and during the campaign he made racially charged statements, including calling the IISD a "black town" and stating that "a vote for me is a vote against a black controlled school district." *Id.* ¶ 33. After Dr. Jones was

elected, he filed two unsubstantiated complaints against the IISD's then-Superintendent, Dr. Dana Bedden ("Dr. Bedden"), an African-American male, and declared his intent to get Dr. Bedden fired. *Id.* In 2013, the IISD investigated Dr. Jones, and he was ultimately censured by the Board of Trustees for violating numerous school policies, including forbidding persons in the IISD from speaking Spanish. *Id.* ¶¶ 36-38. Following his censure, there were new school board elections and Dr. Jones was successful in filling the school board with "like-minded people." *Id.* ¶ 38.

Mr. Mohamed alleges:

> In March 2015, the Irving City Council, with the exuberant backing of Irving Mayor Beth Van Duyne, voted to support a law stating that foreign laws do not apply in U.S. courts. Regarding the need for such legislation, Mayor Van Duyne wrote, in pertinent part, "Sharia Law Court was NOT approved or enacted by the City of Irving . . . . Our nation cannot be so overly sensitive in defending other cultures that we stop protecting our own." Despite similar institutions having existed for decades in the American Jewish and Christian faith communities, the law backed by the Mayor and City Council was created in response to a local Islamic tribunal that mediated in civil cases on a voluntary basis for members of the Muslim community. Mayor Van Duyne and the City Council's actions in this regard created immense tension between the white community and the Muslim community, tensions that were further flamed when, on January 26, 2017, Mayor Van Duyne formally urged lawmakers at the Texas Homeland Security Forum in Austin to investigate the legality of Islamic tribunals in North Texas. In May 2017, Mayor Van Duyne joined the current presidential administration—the same administration headed by a man who in March 2016 said, "I think Islam hates us. There's something there that—there's a tremendous hatred there."

*Id.* ¶ 39.

## C. Allegations Relating to City's Implementation of the Criminal Alien Program

In 2006, the City instituted the Criminal Alien Program ("CAP"), a program run by the Department of Homeland Security that "was meant to give local law enforcement officials access to Immigration and Customs Enforcement ("ICE") information and personnel to facilitate the identification of serious, dangerous criminals and deport them." *Id.* ¶ 40. A report by the University

of California, Berkeley School of Law indicated that CAP "leads to rampant profiling and wrongful arrests." *Id.* The report found that during the City of Irving Police Department's participation in CAP, there was a 150% increase in petty crimes arrests. *Id.* Mr. Mohamed alleges that Congress made clear that ICE "should have no greater enforcement priority than to remove deportable aliens with serious criminal histories from the United States." *Id.* Mr. Mohamed further alleges that "the results of Irving's aggressive arrest policies didn't target serious criminals." *Id.* Mr. Mohamed contends that after the City's Police Department implemented CAP, only 2% of ICE detainees were subject to felony charges, while 98% were charged with misdemeanor offenses. *Id.* Mr. Mohamed alleges that "[a]s a result, Irving police officers engaged in a pattern of unconstitutional arrests." *Id.*

## II.     Rule 12(b)(6) Standard

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption

that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier,* 509 F.3d at 675; *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan*

*Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

## III.    Analysis

The City, the IISD, and Principal Cummings move anew to dismiss Mr. Mohamed's section 1983 claims on the grounds that the Second Amended Complaint does not cure the pleading deficiencies the court identified in *Mohamed I*, and although certain allegations may have been added, the newly pleaded allegations are still insufficient to state a plausible claim for relief or, in the case of Principal Cummings, fail to overcome his entitlement to qualified immunity. The IISD also moves anew to dismiss Mr. Mohamed's Title VI claim on the basis that he has failed to cure the deficiencies set forth by the court in *Mohamed I*.

With respect to Mr. Mohamed's section 1983 claims against the Officer Defendants for unlawful arrest and excessive force in violation of the Fourth Amendment, each officer has asserted his or her entitlement to qualified immunity, and filed a motion to dismiss on this basis. In addition to asserting qualified immunity, Officers Taylor and Howman contend that dismissal is required on the face of the pleadings, as Mr. Mohamed alleges that it was Sgt. Miller and Sgt. Mitchell who made the decision to arrest A.M. and who used force against him, rather than either of them, thereby defeating any Fourth Amendment claim against them for arrest without probable cause or excessive force.

The court will address the City's and the IISD's respective motions to dismiss Mr. Mohamed's section 1983 claims together, as they are both government entities. Both the City and the IISD argue that the amended pleadings are insufficient to cure the deficiencies detailed by the court in *Mohamed I.*

A.    **Section 1983 Claims Against the City and the IISD**

Title 42 U.S.C. § 1983 "provides a civil remedy in federal court for violations, under color of state law, of a person's constitutionally recognized rights, privileges, or immunities." *Miller v. Metrocare Servs.*, 809 F.3d 827, 833 (5th Cir.), *cert. denied*, 136 S. Ct. 2463 (2016) (quoting *Bledsoe v. City of Horn Lake*, 449 F.3d 650, 653 (5th Cir. 2006)).[4]  To state a claim under section 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the

---

[4] Section 1983 provides in part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

United States, and (2) demonstrate that the alleged deprivation was committed by a person or entity acting under color of state law. *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005) (citations omitted); *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998) (citations omitted).

A governmental entity, such as the City or the IISD, can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A governmental entity *cannot* be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Id.*; *see also Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 380 (5th Cir. 2007) ("A school district has no vicarious liability under § 1983."); *Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979) (recognizing that "state vicarious liability doctrines are inapplicable in [section] 1983 suits."). Official policy is defined as:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [school district or city] lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of [school district or city] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [school district or city] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the [school district or city] or to an official to whom that body had delegated policy-making authority.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*); *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*). For purposes of a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts from which the court can reasonably infer that the "challenged policy was promulgated or ratified by the city's policymaker." *Groden v. City of Dallas, Texas*, 826

F.3d 280, 285 (5th Cir. 2016). "[C]ourts should not grant motions to dismiss for [the] fail[ure] to plead the specific identity of the policymaker." *Id.* (citing *Johnson v. City of Shelby, Miss.*, __ U.S. __, 135 S. Ct. 346 (2014)). The ultimate question in deciding the sufficiency of a complaint is whether a person has alleged facts to show that a policymaker promulgated or ratified an unconstitutional policy that resulted in injury to him or her.

To defeat "a motion to dismiss, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts.'" *Balle v. Nueces Cty. Tex.*, 690 F. App'x 847, 852 (5th Cir. 2017) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)). In other words, the pleadings are adequate with respect to a section 1983 claim against a governmental entity when they set forth "specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy or practice was the moving force" for the constitutional violation asserted. *Id.* (citation omitted).

### 1.      The City - Fourth Amendment Claims

In *Mohamed I*, the court held that Mr. Mohamed failed "to allege a policy, custom, or practice of the City that was the moving force behind A.M.'s allegedly unconstitutional arrest in violation of the Fourth Amendment, or to adequately allege the elements of a failure to train claim[,]" and, therefore, dismissed Mr. Mohamed's Fourth Amendment claim against the City. *Mohamed I*, 252 F. Supp. 3d at 619. Specifically, the court stated:

> First, Plaintiff fails to identify any official policy that allegedly caused the underlying constitutional violation. In the absence of an officially promulgated policy, Plaintiff must allege a constitutional deprivation that was more than an isolated incident but was caused by a practice that was sufficiently widespread to constitute a custom having the force of law . . . Plaintiff has not made these allegations. Accordingly, the court is left with an isolated, allegedly unconstitutional

incident, which is generally insufficient to establish an official policy or custom for section 1983 purposes.

*Id.* at 618 (citations omitted). The court also rejected Mr. Mohamed's reliance on allegations concerning the City's participation in the CAP program, noting that "the court is unable to connect participation by the City in CAP, a program the Complaint alleges was supervised by DHS and designed to target criminal aliens, with the police officers' arrest of A.M., a United States citizen, or the contention that the arrest was made without probable cause." *Id.* The court further rejected Mr. Mohamed's reliance on a seven-year old policy brief authored by two individuals affiliated with Berkeley Law School (the "Berkeley report") concerning race and ethnicity, explaining that it "failed to understand the connection between [this report], and any allegation that a policy or custom of the City was a moving force behind A.M.'s arrest." *Id.* at 618 n.8.

The court also dismissed Mr. Mohamed's failure to train claim, explaining that:

> As an alternative basis for a section 1983 claim against the City, Plaintiff makes the conclusory allegation that the Irving Police Department failed to properly train and supervise its officers with respect to determining probable cause for arrest. *See* Compl. ¶¶ 88-91. Plaintiff, however, fails to allege how the City's training policy on probable cause was inadequate. Rather, Plaintiff relies on the conclusory allegation that "Irving police officers engaged in a pattern of unconstitutional detentions/arrests at least as far back as 2006." *Id.* ¶ 88. Plaintiff also makes the conclusory allegation that, at some unknown time in the past, the City's police chief allegedly acknowledged a pattern of unconstitutional detentions and arrests. *Id.* These conclusory allegations are inadequate to support a failure to train claim. There are no allegations concerning what type of training was being provided to the Irving police officers at or near the time A.M. was arrested, or any allegations as to how the training was defective. Absent such allegations, the Complaint fails to state a section 1983 claim for failure to train. *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010) (For liability to attach based on an inadequate training program, a plaintiff must allege with specificity how a particular training program of a city is defective.) (citation omitted).

*Id.* at 618-19. In addition, based on Mr. Mohamed's lack of response to the City's motion to dismiss

his claim that it was liable under section 1983 for failure to supervise, the court dismissed this claim

based on waiver and abandonment. *Id.* at 619 n.9.

In the Second Amended Complaint, Mr. Mohamed provides no new allegations concerning

any policy or custom of the City. Instead, he continues to rely on the City's participation in the CAP

program and on the Berkeley report. *Compare* Orig. Compl. ¶¶ 86-90 (Doc. 27) *with* Sec. Am.

Compl. ¶¶ 95-98 (Doc. 34). The court agrees with the City that: "Plaintiff's persistent reliance on

the CAP Program and the Berkeley report in support of their [municipal liability] claim is

inexplicable, as the Court has already explicitly rejected any connection between CAP and the

Berkeley report and Plaintiff's claims." City's Reply 7 (Doc. 63).[5]

While Mr. Mohamed has not identified a specific policy, or adequately alleged a custom or

practice, that was the moving force behind any alleged violation of A.M.'s Fourth Amendment

rights, he has added the following to his original allegation that in March of 2015, the City Council

voted in support of a state law providing that foreign laws do not apply in United States courts:

---

[5] The City attaches the Berkeley report as an exhibit to its motion to dismiss. As the Berkeley report is referred to in the Second Amended Complaint and central to the claims, the court may properly consider it for purposes of determining whether Mr. Mohamed has stated a claim. *See Collins*, 224 F.3d at 498-99 ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.") (citation omitted). The Berkeley report is also a publicly available document of which the court may take judicial notice. *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir, 2007) ("[I]t is clearly proper in deciding a Rule 12(b)(6) motion to take judicial notice of matters of public record.") (citation omitted). The Berkeley report, assuming its admissibility, does not provide any support for Mr. Mohamed's section 1983 claims. The Second Amended Complaint alleges that A.M. was an African-American Muslim and alleges he was discriminated against on that basis. The Berkeley report only identifies increases in the arrests of Hispanics over a twenty-three month period from 2006-2007 and concludes that the City's police racially profiled Hispanics; it does not address any racial profiling concerns with respect to African-Americans or Muslims and says nothing about arrests without probable cause.

In March 2015, the Irving City Council, with the exuberant backing of Irving Mayor Beth Van Duyne, voted to support a law stating that foreign laws do not apply in U.S. courts. Regarding the need for such legislation, Mayor Van Duyne wrote, in pertinent part, "Sharia Law Court was NOT approved or enacted by the City of Irving . . . . Our nation cannot be so overly sensitive in defending other cultures that we stop protecting our own." Despite similar institutions having existed for decades in the American Jewish and Christian faith communities, the law backed by the Mayor and City Council was created in response to a local Islamic tribunal that mediated in civil cases on a voluntary basis for members of the Muslim community. Mayor Van Duyne and the City Council's actions in this regard created immense tension between the white community and the Muslim community, tensions that were further flamed when, on January 26, 2017, Mayor Van Duyne formally urged lawmakers at the Texas Homeland Security Forum in Austin to investigate the legality of Islamic tribunals in North Texas. In May 2017, Mayor Van Duyne joined the current presidential administration—the same administration headed by a man who in March 2016 said, "I think Islam hates us. There's something there that—there's a tremendous hatred there."

*Id.* ¶ 39. With respect to these new allegations, Mr. Mohamed has failed to plead facts sufficient to establish, or from which the court can reasonably infer, that any policy of the City supporting a state law prohibiting application of foreign laws in United States courts was the moving force behind A.M.'s arrest or of any arrest allegedly made without probable cause by the City's police officers; or that any alleged statements by Mayor Van Duyne or President Trump establish a policy of the City that is connected in any way to A.M.'s arrest for bringing a hoax bomb to school. Further, what President Trump, former-Mayor Van Duyne, or any government official of the President's administration says, is quite beside the point and does not factor into the court's analysis insofar as its resolution of the issues in this case. Moreover, nothing in the pleadings even remotely intimates that the City Council of Irving has abdicated its policymaking authority or oversight function for the City and delegated such authority or oversight to President Trump or any official in his administration. Such alleged statements regarding President Trump or ex-Mayor Van Duyne simply have no nexus to the issues in this case.

As to Mr. Mohamed's claim that the City's police department failed to train its officers with respect to determining probable cause for arrest, the Second Amended Complaint contains no new allegations, and continues to rely on conclusory allegations that are insufficient under *Twombly*, 550 U.S. at 570.[6]  Accordingly, for the reasons already set forth in *Mohamed I*, the court concludes that the failure to train allegations in the Second Amended Complaint are insufficient.  *See Mohamed I*, 252 F. Supp. 3d at 618-19.

Finally, although the Second Amended Complaint, like the original Complaint, alleges a claim against the City for failure to supervise its officers, Mr. Mohamed once again fails to address the City's motion to dismiss this claim in his response brief.  As such, the court concludes, as it did in *Mohamed I*, that he has conceded that he has failed to state a claim for failure to supervise against the City or, alternatively, by not addressing this claim, he has abandoned it.  Accordingly, this claim will be dismissed.

In sum, for the reasons stated above and those set forth in *Mohamed I*, incorporated herein by reference as if repeated verbatim, the court concludes that Mr. Mohamed has failed to cure the pleading deficiencies pointed out by the court in *Mohamed I* with respect to his section 1983 claim against the City.  Specifically, even considering the amended pleadings, Mr. Mohamed has failed to adequately allege a policy or custom of the City that was the moving force behind the alleged Fourth Amendment constitutional violations, or adequately pleaded a failure to train claim.  *See*

---

[6] To the extent Mr. Mohamed, in response to the City's motion to dismiss, argues that the City failed to train its officers with respect to identifying custodial interrogation and the need for Miranda warnings, the court disregards this argument, as it was not raised in the pleadings.  *Cutrera v. Board of Supervisors of La. St. Univ.*, 429 F.3d 108, 114 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a [dispositive motion] is not properly before the Court.") (citation omitted).  The only failure to train claim alleged in the pleadings is a claim for failure to train officers with respect to determining probable cause for arrest.  *See* Sec. Am. Compl. ¶¶ 98-99.

*Iqbal*, 556 U.S. at 678 ("Threadbare recitals of elements of causes of action, supported by mere conclusory statements, do not suffice."). Accordingly, the court will grant the City's motion to dismiss Mr. Mohamed's section 1983 claim for Fourth Amendment violations.[7]

### 2.    The IISD - Fourteenth Amendment Equal Protection Claim

In *Mohamed I*, the court granted the IISD's motion to dismiss Mr. Mohamed's Fourteenth Amendment equal protection claim. The court explained:

> First, other than wholesale conclusory and speculative statements, Mr. Mohamed does not allege any facts from which this court can reasonably infer that any IISD employee intentionally discriminated against A.M. based on his race or religion. Mr. Mohamed does not allege that the IISD treated A.M. differently because of his race or religion than other students involved in similar disciplinary situations. Absent allegations of intentional discrimination, or allegations from which the court can reasonably infer intentional discrimination, Mr. Mohamed fails to allege an equal protection violation against the IISD. *See Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) ("[T]o state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race.") (citations omitted).

> Alternatively, Mr. Mohamed fails to allege adequately facts to support liability against the IISD under section 1983. Mr. Mohamed does not allege that the IISD's Board of Trustees maintained an unconstitutional policy of discriminatory discipline based on race or religion. The sole allegation in the Complaint is that a "pattern of discrimination" in the IISD, as shown by student discipline statistics allegedly compiled by the TEA, "led directly" to the "over-discipline of [A.M.] for showing off his home-made clock-in-a-pencil-box to his teachers." Compl. ¶ 87. The law is clear that "the description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Birabil v. Martinez*, 2016 WL 4402259, at *5 (N.D. Tex. July 11, 2016) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)) (report and recommendation adopted, 2016 WL 4411412 (N.D. Tex. Aug. 18, 2016)).

---

[7] To the extent Mr. Mohamed is suing the Officer Defendants in their official capacity, the court **dismisses** these claims as redundant of the claims against City. *See generally Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as against the entity. It is not against the official personally, for the real party in interest is the entity.")).

In *Spiller*, the Fifth Circuit found the allegation that several policies "led to" unspecified "unconstitutional arrests and confinements," and that a departmental policy of "engag[ing] in conduct toward African American citizens without regard to probable cause to arrest" were too vague and conclusory to support alleged municipal liability under *Monell*. 130 F.3d at 167. Mr. Mohamed's allegations fail for the same reason.

Further, allegations regarding findings of disparate discipline in TEA reports and an alleged anti-Muslim bias in the community are not "facts [that] establish that the challenged policy was promulgated or ratified by the [school district's] policymaker," in this case the Board of Trustees. *See Groden*, 826 F.3d at 285.[8]

*Mohamed I*, 252 F. Supp. 3d at 616-17.

Having reviewed the allegations in the Second Amended Complaint, the court concludes that, as with the original Complaint, it does not contain sufficient factual allegations from which the court can reasonably infer that A.M. was subject to unequal disciplinary treatment based on his religion or race, and does not contain adequate factual allegations to state a plausible section 1983 claim against the IISD based on a policy or custom that led to a constitutional deprivation. For these reasons, as well as those set forth in the IISD's legal brief, the court determines that Mr. Mohamed's section 1983 equal protection claim against the IISD should be dismissed for failure to state a claim.

The court notes that Mr. Mohamed makes a new allegation regarding a separate lawsuit brought by a Sunni Muslim student against the IISD alleging peer harassment based on his religion. *See* Sec. Am. Compl. ¶ 79 (citing *Iqbal Bhombal, Individually and as Next Friend of Z.B., a Minor v. Irving Indep. Sch. Dist. and Lindsay Sanders, in her Individual Capacity*, Cause No. 3:17-cv-01276-D (N.D. Tex., filed May 11, 2017)). Assuming the facts as true in the *Bhombal* case,

---

[8] Under Texas law, the final policymaking authority in an independent school district rests with the district's trustees. *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993). Texas Education Code § 11.051(a)(1) provides: "An independent school district is governed by a board of trustees who, as a body corporate, shall[] oversee the management of the district[.]" The Texas Education Code further provides, "[T]he trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district," and that "[T]he trustees may adopt rules and bylaws necessary to carry out the[ir] powers and duties[.]" *Id.* § 11.151(b) and (d).

references to peer harassment are irrelevant to Mr. Mohamed's section 1983 claims against the IISD, as peers are not state actors. Further, allegations in a lawsuit filed seventeen months after the September 14, 1015 incident at issue, in no way cure the lack of adequate pleadings in this case. In addition, the court notes that the CM-ECF Docket Sheet in that case reflects that on September 19, 2017, that action was dismissed without prejudice based on the plaintiffs' failure to show good cause for failing to effect service of process on the defendants. *See* Cause No. 3:17-cv-01276-D (Doc. 10).

Further, the allegation in the Second Amended Complaint that "anti-Muslim bias permeated" the IISD, referring to a chain e-mail from a community member, and an alleged report that found "bias against radical Islam" in Texas's state-wide curriculum management system, are also insufficient to allege that the IISD adopted or promulgated an official policy of racial or religious discrimination or that there was such a "persistent, widespread practice" of discrimination "so common and well-settled" that it fairly represents IISD policy. *See Bennett*, 735 F.2d at 862.

Mr. Mohamed in his response asserts that he needs a chance to conduct discovery to find out if his suspicions against the IISD are true and that it treated similarly situated students differently based on racial or religious criteria. *See* Pl.'s Resp. 16-20 (Doc. 44). According to Mr. Mohamed, he is unable to obtain this information because the Family Educational Rights and Privacy Act ("FERPA") regulates disclosure of student records. In reply, the IISD contends that Mr. Mohamed's request for discovery "places the cart before the horse." *See* IISD's Reply 9 (Doc. 46). The court agrees.

Before proceeding to discovery, a plaintiff must plead enough facts to state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678 (a complaint must provide "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). As

the Court stated in *Iqbal*, Federal Rule of Civil Procedure 8 "does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. In addition, Mr. Mohamed

fails to cite any authority that FERPA somehow alters the pleadings standards in cases against school

districts.

In sum, for the reasons stated above and those set forth in *Mohamed I*, incorporated herein

by reference as if repeated verbatim, the court concludes that Mr. Mohamed has failed to cure the

pleading deficiencies pointed out by the court in *Mohamed I*. Accordingly, the court will grant the

IISD's motion to dismiss Mr. Mohamed's section 1983 claim for violations of the Equal Protection

Clause of the Fourteenth Amendment.

### B.        Section 1983 Claims Against the Individual Defendants

The court now turns to Mr. Mohamed's section 1983 claims against Principal Cummings,

Sgt. Miller, Sgt. Mitchell, Officer Taylor, and Officer Howden. Each of these Defendants is a state

actor who has asserted his or her entitlement to qualified immunity.

Government officials who perform discretionary functions are entitled to the defense of

qualified immunity, which shields them from suit as well as liability for civil damages, if their

conduct does not violate "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A defendant official

must affirmatively plead the defense of qualified immunity. *Gomez v. Toledo*, 446 U.S. 635, 640

(1980). All Individual Defendants have asserted this defense in their motions to dismiss.

In deciding a dispositive motion that raises the defense of qualified immunity, the Supreme

Court initially set forth a mandatory two-part inquiry for determining whether a government official

was entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under *Saucier*, a

court must determine first whether the facts alleged or shown are sufficient to make out a violation of a constitutional or federal statutory right. If the record sets forth or establishes no violation, no further inquiry is necessary. On the other hand, if the plaintiff sufficiently pleads or establishes that a violation could be made out, the court must determine whether the right at issue was clearly established at the time of the government official's alleged misconduct. *Id.* The Court relaxed this mandatory sequence in *Pearson v. Callahan*, 555 U.S. 223 (2009), and stated, "[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory," and judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. The second prong of the test "is better understood as two separate inquiries: whether the allegedly violated constitutional right[] [was] clearly established at the time of the incident; and if so, whether the conduct of the defendant[] [official] was objectively unreasonable in light of then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (internal quotation marks and citations omitted); *see also Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999); *Hare v. City of Corinth,* 135 F.3d 320, 326 (5th Cir. 1998); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995).

Ordinarily, one who pleads an affirmative defense must establish his entitlement to such defense. In the context of qualified immunity, however, this burden varies from the norm. In this circuit, the rule is as follows:

> Where . . . [a] defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.

*Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (internal quotations and citations omitted); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. at 640; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998); and *Pierce v. Smith*, 117 F.3d at 871.

In *Anderson*, 483 U.S. at 641, the Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him. If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster*, 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640. For

an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Pierce v. Smith*, 117 F.3d at 882 (emphasis in original and citation omitted); and *Stefanoff v. Hays County*, 154 F.3d at 525. Stated differently, while the law does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted).

In analyzing qualified immunity claims, the Supreme Court has "repeatedly told courts … to not define clearly established law at a high level of generality." *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (citation omitted). Pursuant to *Mullenix*, courts must consider "whether the violative nature of *particular* conduct is clearly established" and must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotations marks omitted).

### 1. Principal Cummings[9]

In *Mohamed I*, the court dismissed Mr. Mohamed's section 1983 claims against Principal Cummings, concluding that he failed to state an equal protection violation based on his race or religion:

> Viewing all well-pleaded allegations as true and drawing all reasonable inferences in favor of Mr. Mohamed, the court determines that the Complaint fails to plead facts from which the court can reasonably infer that Principal Cummings's complained-of conduct was motivated by unlawful racial or religious animus. To the extent the Complaint alleges that Principal Cummings intentionally discriminated

---

[9] It is well-established that school administrators, such as principals, are state actors for purposes of section 1983. *See, e.g., Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521 (5th Cir. 1994) (DISD school principal treated as state actor by court).

against A.M. based on his race or religion, the allegations are wholly conclusory and fail to "raise a right to relief above the speculative level . . . [even] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *See Twombly*, 550 U.S. at 555.

*Mohamed I*, 252 F. Supp. 3d at 623.[10]   The court also determined that "allegations that the IISD has a pattern of disciplining African-American students more harshly than other students, that the IISD generally had an anti-Muslim bias, that Principal Cummings was aware of TEA reports reflecting such disparity, or that other school officials displayed racial animus, are insufficient as a matter of law to impute liability to Principal Cummings." *Id.* at 624 (quoting *Iqbal*, 556 U.S. at 676) ("[B]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own* individual actions, has violated the Constitution.").

The court went on to conclude that, even assuming that Mr. Mohamed had met the threshold requirement of alleging an underlying constitutional violation, Principal Cummings was, nevertheless, entitled to qualified immunity because Mr. Mohamed had failed to allege facts from which the court could conclude that Principal Cummings acted in an objectively unreasonable manner. *Id.* at 625.

> Principals are responsible for the safety of students and others on campus and, as part of that responsibility, often have to make decisions quickly and with little

---

[10] "[T]o state a claim of racial discrimination under the Equal Protection Clause and section 1983, the plaintiff 'must allege that [(1) he or she] received treatment different from that received by similarly situated individuals and that [(2)] the unequal treatment stemmed from a discriminatory intent.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015) (quoting *Priester v. Lowndes Cty.,* 354 F.3d 414, 424 (5th Cir.2004) (in turn quoting *Taylor v. Johnson,* 257 F.3d 470, 473 (5th Cir. 2001)). "Allegations [of discriminatory intent] that are merely conclusory, without reference to specific facts, will not suffice." *Fennell*, 804 F.3d at 412 (quoting *Priester,* 354 F.3d at 420). The same analysis applies to equal protection claims based on religious discrimination. *See Sonnier v. Quarterman*, 476 F.3d 349, 368 n.17 (5th Cir. 2007).

information. The court acknowledges that A.M. repeatedly stated that the device in question was an alarm clock and not a bomb; however, in light of well-documented incidents in this country of students bringing weapons and other prohibited devices to school, one in Principal Cummings's position cannot rely on or accept such assertions without at least conducting some level of investigation or sufficient inquiry to ensure that the device does not pose a risk to the safety of students and others on campus.

　　　　　　　* * *

This is not a situation in which a person standing in Principal Cummings's shoes can take unnecessary risks. It would have been fatuous or nonsensical for Principal Cummings to do nothing and wait for something to occur before acting. Further, Plaintiff implicitly assumes that Principal Cummings had some level of expertise and experience in dealing with bombs or explosives and thereby should have known the device was not a bomb but merely an alarm clock. By Plaintiff's own admission, his son disobeyed a teacher's instructions to keep the device in his backpack. Contrary to this admonition, A.M. showed the device to another student, and ultimately the device caught the attention of Ms. West.

　　　　Public officials are entitled to qualified immunity unless it is shown that their actions are objectively unreasonable. One may consider a three-day suspension imposed on A.M. to be harsh and unreasonable, but the court is not prepared to conclude that Principal Cummings's actions were objectively unreasonable based on the allegations of the Complaint. A principal's fate is not so hapless that, on the one hand, by not taking action he is faced with the gruesome prospect of death or serious injury of persons had the device actually been a bomb and exploded; and, on the other hand, he is faced with a federal lawsuit for denial of a student's constitutional rights because the device turned out not to be a bomb. *Woe unto the principal who fails to act on a potential threat that later becomes a reality!* To hold Principal Cummings, or any other administrator, to this standard places him between the dreaded Scylla and Charybdis.

*Id.* at 625-26 (footnote omitted).

In his pending motion to dismiss, Principal Cummings asserts he is entitled to qualified immunity and moves anew to dismiss Mr. Mohamed's section 1983 claims against him on the grounds that the Second Amended Complaint does not cure the pleading deficiencies the court identified in *Mohamed I*, and although certain allegations may have been added, the newly pleaded

allegations are still insufficient to state a plausible claim for relief and overcome his entitlement to qualified immunity. The court agrees.

While the majority of the pleadings in the Second Amended Complaint pertaining to Principal Cummings are the same as in the original Complaint, Mr. Mohamed includes the new allegation that Principal Cummings ignored IISD procedure by not following a student handbook procedure relating to student questioning by law enforcement. *See* Sec. Am. Compl. ¶ 92. The IISD Student Handbook provides, in pertinent part:

> LAW ENFORCEMENT AGENCIES (All Grade Levels)
> Questioning of Students
> . . . .
> - The principal will verify and record the identity of the officer or other authority and ask for an explanation of the need to question or interview the student at school.
> - The principal ordinarily will make reasonable efforts to notify the parents unless the interviewer raises what the principal considers to be a valid objection.

*Id.* ¶ 62.

A deviation from an entity's internal procedures, without more, does not show discriminatory intent or amount to a constitutional violation, as constitutional requirements may nevertheless have been met. *See generally Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Brown v. Texas A&M Univ.*, 804 F.2d 327, 335 (5th Cir. 1989) (holding that no underlying constitutional violation supported denial of immunity when pretermination procedures in university policy manual were not applied to employee's resignation); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) (employer's failure to

adhere to employee handbook procedures or its own policy not probative of discriminatory animus without proof that plaintiff was treated differently than other nonminority employees) (Title VII).

As earlier stated, qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. Principal Cummings's alleged conduct falls into neither category. After reviewing the Second Amended Complaint, the court simply cannot go so far as to say, based on the allegations presented, that Principal Cummings was "plainly incompetent" or "knowingly violate[d] the law" or A.M.'s constitutional rights. Moreover, the Second Amended Complaint contains no new allegations from which the court can reasonably infer that Principal Cummings would have acted differently if the student bringing the device to school and showing it to others in violation of a teacher's orders had been non-African American or non-Islamic.

In sum, for the reasons stated above and those set forth in *Mohamed I*, incorporated herein by reference as if repeated verbatim, the court concludes that Mr. Mohamed has failed to cure the pleading deficiencies pointed out by the court in *Mohamed I* with respect to his section 1983 claim against Principal Cummings. Accordingly, the court will grant Principal Cummings's motion to dismiss based on qualified immunity.

### 2. The Officer Defendants

#### a. Fourth Amendment False Arrest Claim

Mr. Mohamed contends that Officer Taylor, Officer Howman, Sgt. Miller, and Sgt. Mitchell violated A.M.'s Fourth Amendment constitutional right to be free from arrest without probable cause when Sergeants Miller and Mitchell decided to arrest him under the "hoax bomb" statute. Section 46.08 of the Texas Penal Code defines the offense of possession of a hoax bomb as follows:

(a) A person commits an offense if the person knowingly manufactures, sells, purchases, transports, or possesses a hoax bomb with the intent to use the hoax bomb to:

> (1) make another believe that the hoax bomb is an explosive or incendiary device; or

> (2) cause alarm or reaction of any type by an official of a public safety agency or volunteer agency organized to deal with emergencies.

Tex. Penal Code Ann. § 46.08(a) (West 2011). An offense under the "hoax bomb" statute is a Class A misdemeanor. *Id.* § 46.08(b). Section 46.01(13) defines "hoax bomb" as:

> a device that (A) reasonably appears to be an explosive or incendiary device or (B) by its design causes alarm or reaction of any type by an official of a public safety agency or a volunteer agency organized to deal with emergencies.

*Id.* § 46.01(13).

The Officer Defendants move to dismiss this claim based on qualified immunity, arguing that Mr. Mohamed fails to allege any underlying Fourth Amendment violation and that they did not violate clearly established law of which a reasonable law enforcement officer would have known. In addition, Officers Taylor and Howman contend that dismissal is required because Mr. Mohamed alleges that it was Sgt. Miller and Sgt. Mitchell who made the decision to arrest A.M., rather than either of them, thereby defeating any Fourth Amendment claim against them for arrest without probable cause.

In response, Mr. Mohamed argues that the Officer Defendants did not possess any evidence indicating A.M. had the requisite intent under the "hoax bomb" statute, and were aware that no person at the school alleged that A.M. had threatened or tried to cause alarm to any person, much less an official of a public safety agency. According to Mr. Mohamed, the true function of the alarm clock could be discerned within seconds of inspection, and "[i]t is clear that no one—not the

teachers, the school administrators not the police officers, including Mitchell and Miller, believed the alarm clock to be an explosive device as they showed no alarm and did not handle it as an explosive device." Pl.'s Resp. to Defs. Miller and Mitchell's Mot. to Dismiss 15 (Doc. 47). In addition, Mr. Mohamed argues that the right not to be arrested without probable cause was clearly established. He further argues that he "actually believes that any reasonable person who can read the English language would understand that probable cause did not exist to arrest A.M. for violating Section 46.08 under these circumstances[.]" Pl.'s Resp. to Defs. Taylor and Howman's Mot. to Dismiss 16 (Doc. 56).

### i. Officers Taylor and Howman

Officers Taylor and Howman contend that dismissal is required on the face of the pleadings, as Mr. Mohamed alleges that it was Sgt. Miller and Sgt. Mitchell who made the decision to arrest A.M., rather than either of them, thereby defeating any Fourth Amendment claim against them for arrest without probable cause. The court agrees. The Second Amended Complaint alleges: "Officers Mitchell and Miller made the decision to arrest A.M. for bringing a hoax bomb to school." Sec. Am. Comp. ¶ 100. By Mr. Mohamed's own admission, the decision to arrest A.M. was made by the sergeants, not the school resource officers. In light of this allegation, the court concludes that Mr, Mohamed has failed to allege that Officers Taylor and Howman violated A.M.'s Fourth Amendment right to be free from arrest without probable cause. Accordingly, the court will grant Officers Howman's and Taylor's respective motion to dismiss this claim.[11]

---

[11] Mr. Mohamed alleges that Principal Cummings and Officer Howman escorted A.M. from his classroom to another room in the school where four other City police officers were waiting, and that upon A.M.'s entry into the room, Officer Taylor stated: "Yep, that's who I thought it was." Sec. Am. Compl. ¶ 61. Viewing this bald allegation in the light most favorable to Mr. Mohamed, it does nothing to show that any action was taken by Officer Taylor or any other Defendant because of A.M.'s race or religion.

### ii.     *Sergeants Miller and Mitchell*

Sergeants Miller and Mitchell assert their entitlement to qualified immunity and move to dismiss Mr. Mohamed's claim that they violated A.M.'s constitutional rights under the Fourth Amendment by arresting him without probable cause.  First, they argue that Mr. Mohamed has failed to state an underlying constitutional violation.   Second, they argue they are entitled to qualified immunity because Mr. Mohamed has only pled vague, conclusory allegations concerning whether the applicable law was clearly established at the time of A.M.'s arrest and because he defines the applicable law at "too high a level of generality."  Defs.' Mot. to Dismiss 21 (Doc. 42).

### a.     *Probable Cause Standard*

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment [when] there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  The court, therefore, begins its analysis by setting forth the meaning of probable cause in the context of an arrest or detention.  Probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that [one] has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (citations omitted).  When determining whether a reasonable person would have believed that an offense occurred, a court considers the expertise and experience of law enforcement officials. *United States v. Garcia*, 179 F.3d 265, 268 (5th Cir. 1999) (citing *United States v. Ortiz*, 442 U.S. 891, 897 (1975)).   "Probable cause 'does not demand any showing that [the belief that an offense was committed] be correct or more likely true than false.'"  *Piazza v. Mayne*, 217 F.3d 239, 245-46

---

Moreover, Mr. Mohamed has not brought a claim against Officer Taylor for equal protection violations.

(5th Cir. 2000) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). In determining whether probable cause exists, a court is required to find a basis for an officer to believe to a "fair probability" that an offense occurred. *Id.* (citing *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir. 1985)) (citations omitted). A "fair probability" does not mean that a reasonable person would have believed it more likely than not, which is a preponderance of the evidence standard, that an offense occurred. *Garcia*, 179 F.3d at 269; *Antone*, 753 F.2d at 1304. It means "something more than a bare suspicion, but need not reach the fifty percent mark." *Garcia*, 179 F.3d at 269; *see also United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001). A police officer who has probable cause to believe that a person has committed even a minor offense may arrest the offender, and the arrest does not violate the Fourth Amendment. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

b.        *Was the Law Clearly Established?*

In the present case, the Second Amended Complaint alleges that Sergeants Miller and Mitchell made the decision to arrest A.M. for violating the "hoax bomb" statute contained in section 46.08 of the Texas Penal Code. Sergeants Miller and Mitchell have moved to dismiss Mr. Mohamed's claim that they violated A.M.'s rights by arresting him without probable cause for violating the "hoax bomb" statute. In support, they assert their entitlement to qualified immunity. Whether Sergeants Miller and Mitchell committed an underlying constitutional violation is not the focus of the court's inquiry at this juncture. To meet his burden of demonstrating the inapplicablity of Sergeants Miller's and Mitchell's assertion of their qualified immunity defense, Mr. Mohamed must establish *both* that: (1) they violated a statutory or constitutional right, *and* (2) that the right was "clearly established" at the time of the conduct.

As recently stated by the Fifth Circuit in summarizing the governing law:

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Thus, the right must already be clearly established at the time of the challenged conduct. When considering whether a defendant is entitled to qualified immunity, the court must ask whether the law so clearly and unambiguously prohibited his conduct that every reasonable official would understand that what he is doing violates the law. To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity. Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established. This is true even when the circuit split developed after the events in question.

*Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (internal punctuation and citations omitted). "Further, as the Supreme Court has explained, '[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.") (citing *Saucier*, 533 U.S. at 206); *Anderson*, 483 U.S. at 638 ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks omitted)); *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 383 n.1 (5th Cir. 2009) ("[T]o evaluate the 'clearly established law' prong of the qualified immunity test, the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the right.").

"It is the plaintiff's burden to find a case in his favor that does not define the law at a 'high level of generality.'" *Vann v. City of Southhaven, Miss.*, __ F.3d __, 2018 WL 1147115, at *1 (5th Cir. March 5, 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 732-33 (5th Cir. 2016)). A

plaintiff fails to meet his or her burden of "showing specific law on point" when he or she does not

cite "a pre-existing or precedential case" from either the Fifth Circuit of Supreme Court that places

an officer on notice that his conduct in question violates the Constitution. *Id.* (affirming district

court's grant of summary judgment in officer's favor in excessive force case because plaintiff "cited

nary a pre-existing or precedential case," as this "dooms his case here.").

The court concludes that Mr. Mohamed has failed to meet his burden of demonstrating that

under clearly established law, a reasonable officer in the position of Sergeants Miller and Mitchell

would have had fair warning that he lacked probable cause to arrest A.M. for bringing a "hoax

bomb" to school in violation of section 46.08 of the Texas Penal Code. At the outset, Mr. Mohamed

relies on the general proposition that arrest without probable cause is a constitutional violation,

which defines the parameters of this claim at a high degree of generality. *See al-Kidd*, 563 U.S. at

742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of

generality. The general proposition, for example, that an unreasonable search or seizure violates the

Fourth Amendment is of little help in determining whether the violative nature of particular conduct

is clearly established.") (citations omitted). That general proposition of law is not in dispute;

however, Mr. Mohamed makes no attempt to define the "clearly established" law at an appropriate

level of specificity and relies instead on the broadest proposition of law. With this level of

generality, he has failed to meet his burden of pointing to then-extant clearly established law that

would have apprised reasonable officers in the position of Sergeants Miller and Mitchell that their

decision to arrest A.M. under the "hoax bomb" statute was clearly unlawful. Mr. Mohamed has not

attempted to define the applicable law in the specific context in which A.M.'s arrest occurred:

whether it was clearly established that officers could not arrest a student for the offense of hoax

bomb when the student had brought to school and repeatedly displayed, in disobedience to a teacher's directions, a homemade device which consisted of a small box containing a circuit board, wires, a transformer, and a timing display, when a teacher asked for assistance of police officers in response to this device, and when the student was not forthcoming in response to questioning about his homemade device.

Further, the court notes there are no Supreme Court or Fifth Circuit decisions addressing the "hoax bomb" statute, let alone the contours of probable cause to arrest under the statute; nor has the Texas Supreme Court spoken on the issue of the "hoax bomb" statute.[12]

Moreover, "[t]he mere fact that a person is wrongfully arrested and charged with an offense whose elements are well-settled does not mean that the arrest itself contravenes 'well-settled law.'" *Saldaña v. Garza*, 684 F.2d 1159, 1164 (5th Cir. 1982) (citation omitted). "[I]t is clear that a police officer may be immune from liability under § 1983 even if it is later determined that probable cause for an arrest did not exist." *Id.* (citation omitted). To impose personal liability against a police officer regarding an illegal arrest, a plaintiff is "not only required to show that [an] arrest was illegal; it [is] necessary that he show that the arrest was so illegal as to violate clearly established law." *Id.* at 1165.

For these reasons, the court concludes that Mr. Mohamed's claim that Sergeants Miller and Mitchell lacked probable cause to arrest A.M. fails because then-extant clearly established law would

---

[12] The court has located a state appellate decision concerning the statute. *See Ahmad v. State*, 295 S.W.3d 731 (Tex. App.—Ft. Worth 2009, pet. ref'd). The *Ahmad* case dealt with whether a real bomb fell within the parameters of the statutory definition of "hoax bomb." Even assuming a state court appellate decision could be used to determine the contours of "clearly established" law for qualified immunity purposes, the *Ahmad* case sheds no light on the issue before the court.

not have apprised a reasonable officer in Sergeants Miller's and Mitchell's position that arresting A.M. for bringing a "hoax bomb" to school would run afoul of the Fourth Amendment's prohibition on a warrantless arrest without probable cause.[13]  Accordingly, the court will grant Sergeant Miller's and Sergeant Mitchell's motion to dismiss based on qualified immunity.[14]

### b.     Excessive Force Claims

Mr. Mohamed contends that Officer Taylor, Officer Howman, Sgt. Miller, and Sgt. Mitchell violated A.M.'s Fourth Amendment right to be free from excessive force.  *See* Sec. Am. Compl. ¶¶ 67, 100-102.   Specifically, Mr. Mohamed alleges that:

> Despite the fact that A.M. had told them about making the clock, despite the fact that they realized that it was, indeed, a crude alarm clock, despite th[e] fact that nobody—not one single person—alleged that A.M. had tried to scare them with it, had claimed it was a bomb or weapon or tried to cause alarm, despite the fact that nobody had cleared their classroom, called for emergency protocol or called in a bomb squad, [Sergeants] Miller and Mitchell made the decision to arrest A.M. for the offense of "hoax bomb."  *At that point, [Sergeants] Mitchell and Miller pulled A.M. forcefully out of his chair, yanked his arms up behind his back so far that his right hand touched the back of his neck, causing a lot of pain.  Officer Howman placed A.M. in handcuffs and marched him out of the front of the school, all four officers involved in the arrest, two on each side of A.M.*

*Id.* ¶ 67 (emphasis added).   Mr. Mohamed further alleges:

> Officers Mitchell, Miller, Taylor, and Howman's actions were objectively unreasonable and violated A.M.'s Fourth Amendment rights.  The officers used force when it was objectively unreasonable under the circumstances, resulting in physical

---

[13] Mr. Mohamed alleges that an unnamed Irving police officer noted in an internal e-mail obtained through a FOIA request that: "That thing doesn't even look like a bomb."  Sec. Am. Compl. ¶ 71.  This allegation does nothing to aid Mr. Mohamed in defeating the Officer Defendants' assertion of qualified immunity, as it merely alleges that reasonable officers could disagree regarding whether the device was a "hoax bomb," which as a matter of law does not overcome an officer's entitlement to qualified immunity. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized.").

[14] The court also will grant Officer Taylor's and Officer Howman's respective motions to dismiss on this alternative basis as well.

and emotional damage to A.M. There was no reason under the circumstances to use any force at all on A.M., as fourteen-year old A.M. only ever indicated or represented that the device in question was a non-dangerous clock . . . Indeed, there was absolutely no justification for handcuffing A.M. or using any force or restraint on him, as he had given no person any indication that he was dangerous or that he had legitimately intended to bring a hoax bomb to school. There was no verbal request by anyone to A.M. asking him to comply with any command to come with the officers before he was handcuffed and roughly removed from his school against his will. There was no attempt to escort him in a respectable manner from the school, and no request by the officers to have A.M.'s parents on the scene to discuss the incident prior to A.M., a fourteen-year-old child, being handcuffed and taken to jail. There was no reason to believe that A.M. had committed any crime or was about to commit a crime. In fact, the Defendant officers knew that he was simply showing off his clock invention to his teachers.

*Id.* ¶ 101.

A plaintiff's claim for excessive force must be determined according to Fourth Amendment standards because "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach under the Fourteenth Amendment to the United States Constitution." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citation omitted). The issue of reasonableness centers on whether the officer's actions are "objectively reasonable" in light of the facts and circumstances with which he is faced, without regard to the officer's underlying intent or motivation. *Id.* at 397 (citation omitted). Whether the use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* at 396. In applying

*Graham*, the Fifth Circuit uses a three-part test that requires a plaintiff to allege: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 487 (5th Cir. 2001) (citation omitted)); *Tarver v. Edna*, 410 F.3d 745, 751 (5th Cir. 2005); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000). To state a claim for excessive use of force, the plaintiff's asserted injury must be more than a de minimis injury. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2005). Injury can be one that is physical or psychological. *Ikerd v Blair*, 101 F.3d 430, 434 n.9 (5th Cir. 1996). In the case of a psychological injury, "[o]nly substantial psychological injuries are sufficient to meet the injury element of a claim for excessive force under the Fourth Amendment." *Carter v. Diamond URS Huntsville, LLC*, 2016 WL 8711499, at *5 (S.D. Tex. Sept. 30, 2016) (citing *Flores v. City of Palacios*, 381 F.3d 391, 397-98 (5th Cir. 2004)).

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)); *accord Muehler v. Mena*, 544 U.S. 93, 99 (2005). In *Glenn v. City of Tyler*, the Fifth Circuit held that "handcuffing too tightly, without more, does not amount to excessive force." 242 F.3d at 314. Further, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation omitted).

### i.     *Officers Taylor and Howman*

Officer Taylor asserts he is entitled to qualified immunity on Mr. Mohamed's excessive force claim because the Second Amended Complaint contains no allegations that he was involved in the use of *any* force against A.M.  The court agrees.

Mr. Mohamed alleges that "[Sergeants] Mitchell and Miller pulled A.M. forcefully out of his chair, yanked his arms up behind his back so far that his right hand touched the back of his neck, causing a lot of pain."  *See* Sec. Am. Compl. ¶ 67.  He further alleges that: "Officer Howman placed A.M. in handcuffs and marched him out of the front of the school, all four officers involved in the arrest, two on each side of A.M."  *Id.*  Absent any allegations of the use of any force by Officer Taylor, the court concludes that Mr. Mohamed has failed to allege an underlying Fourth Amendment constitutional violation against Officer Taylor based on the use of excessive force, and he is entitled to qualified immunity.

Officer Howman asserts he is entitled to qualified immunity on the excessive force claim because, although Mr. Mohamed alleges Officer Howman handcuffed A.M., he does not allege any physical injury associated with the handcuffing.  On these pleadings, the court concludes that Mr. Mohamed has failed to allege a constitutional violation by Officer Howman arising from the use of excessive force.  *See Aguilar v. Robertson*, 512 F. App'x 444, 449 (5th Cir. 2013) ( "To succeed on an excessive force claim, [a plaintiff] must demonstrate that he 'suffered at least some form of injury' from the defendant's actions that is more than de minimis.") (citation omitted); *Glenn*, 242 F.3d at 314 (holding that to succeed on an excessive force claim, the resulting injury "must be more than a de minimis injury").

Moreover, to the extent the Second Amended Complaint can be liberally construed as alleging a psychological injury arising from the use of handcuffs, there is no allegation of a substantial psychological injury. *See Flores*, 381 F.3d at 397-98 (requiring a substantial psychological injury to meet the injury element of an excessive force claim). Further, the Supreme Court has addressed whether an "inconvenient and embarrassing" arrest, and the officer's concomitant handcuffing of an arrestee, flouts constitutional norms. *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001). In that case, the officer yelled at the arrestee, "said that he had 'heard [the arrestee's] story two-hundred times,'" and handcuffed her before placing her in the patrol car. *Id.* at 354. The Court concluded that the arrest was not "made in an extraordinary manner, unusually harmful to the arrestee's privacy or . . . physical interest." *Id.* (internal quotation marks and citation omitted). Under *Atwater*, the court concludes that the mere fact of A.M. being placed in handcuffs and being taken out of the school to the patrol car by Officer Howman, even if humiliating or embarrassing, was "not so extraordinary as to violate the Fourth Amendment." *Id.* at 354-55.

In sum, Mr. Mohamed has failed to allege an underlying Fourth Amendment claim of excessive force against Officers Taylor and Howman. Accordingly, the court will grant their respective motions to dismiss the excessive force claims based on qualified immunity.

### ii.     *Sergeants Miller and Mitchell*

Sgt. Miller and Sgt. Mitchell assert they are entitled to qualified immunity on the excessive force claim and move to dismiss on this basis. Specifically, they contend that Mr. Mohamed fails to allege that A.M. suffered any injury during the course of his arrest that was more than de minimis. The court agrees.

Mr. Mohamed alleges: "Mitchell and Miller pulled A.M. forcefully out of his chair, yanked his arms up behind his back so far that his right hand touched the back of his neck, causing a lot of pain." Sec. Am. Compl. ¶ 67. As previously stated: "To succeed on an excessive force claim, [a plaintiff] must demonstrate that he 'suffered at least some form of injury' from the defendant's actions that is more than de minimis." *Aguilar*, 512 F. App'x at 449 (citation omitted). Based on the allegations, A.M.'s alleged injuries are, at best, de minimis.

Minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force. *See Glenn*, 242 F.3d at 314-15 (concluding that "handcuffing too tightly, without more, does not amount to excessive force"); *Freeman v. Gore*, 483 F.3d 404, 416-17 (5th Cir. 2007) (finding no excessive force in a case involving arrestee's allegations that the deputies twisted her arms behind her back while handcuffing her, "jerked her all over the carport," and applied the handcuffs too tightly, causing bruises and marks on her wrist, since "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."); *Tarver*, 410 F.3d at 751-52 (finding no excessive force when plaintiff failed to show requisite injury because he did "not allege any degree of physical harm greater than de minimis from the handcuffing," specifically "acute contusions of the wrist and psychological injury from being handcuffed"); *Montes v. Ransom*, 219 F. App'x 378, 390 (5th Cir. 2007) (rejecting excessive force claim when plaintiff presented evidence of red marks and some swelling because "[s]uch minor injuries are inherently transient, are only de minimis, and are not actionable.").

The allegations of injury in connection with A.M.'s arrest and handcuffing are of no higher a degree than the alleged injuries in the above-cited cases, in which the Fifth Circuit concluded that

the arrestees had failed to allege more than a de minimus injury. Based on this case law, the court agrees with Sgt. Miller and Sgt. Mitchell that the allegations of injury are insufficient to state a plausible claim for excessive force, and they are entitled to qualified immunity.

In response to Sergeant Miller and Mitchell's motion to dismiss the excessive force claim, Mr. Mohamed argues, "[t]here was no reason to use any force at all on A.M., as A.M. only ever indicated or represented that the device in question was a clock." *See* Pl.'s Resp 20 (Doc. 47) (citing *Alexander v. City of Round Rock*, 854 F.3d 298 (5th Cir. 2017)). Sergeants Miller and Mitchell argue that Mr. Mohamed's reliance on *Alexander* is "unavailing." Defs.' Reply 7 (Doc. 48). The court agrees. In *Alexander*, the Fifth Circuit rejected an arresting officer's assertion of qualified immunity at the motion-to-dismiss stage, concluding that the plaintiff had sufficiently alleged that the officer violated clearly established law when: (1) he stopped Mr. Alexander without arguable reasonable suspicion; (2) he arrested him without arguable probable cause; and (3) he used force against him which was objectively unreasonable. *Alexander*, 854 F.3d at 305-309. The Fifth Circuit held that the de minimis injury requirement, while still the law, would not be sufficient to defeat the plaintiff's claim of excessive force. *Id.* at 309 ("Alexander's alleged injuries – though perhaps not sufficient on their own to satisfy the de minimis requirement – are enough to support a claim for excessive force at the motion to dismiss stage."). In *Alexander*, there was no arguable probable cause to arrest so that any use of force to effect the arrest was deemed unreasonable even if the use of force did not produce injuries beyond the de minimis threshold. Here, the court concludes, based on the face of the pleadings, that arguable probable cause existed for the arrest, thereby justifying the use of reasonable force to effect the arrest. Specifically, Mr. Mohamed alleges that A.M. brought to school a device in a small box containing a circuit board, wires, and a timing display, repeatedly

disobeyed a teacher who had told him to keep the device in his backpack, displayed and activated the device during class after being told to keep it in his backpack, and was less than forthcoming when he was questioned about the device. *See* Sec. Am. Compl. ¶¶ 58, 63. A.M. also did not answer Principal Cummings's questions about why he brought the device to school. *See* Defs.' Joint App.2 (Doc. 40-4). Considering these factual allegations, and viewing them in the light most favorable to Mr. Mohamed, and given that these events transpired in a school setting, the court determines that the Officer Defendants had a basis to believe to a fair probability that a hoax bomb violation had occurred, providing them with at least arguable probable cause to arrest A.M.

Further, Mr. Mohamed reads *Alexander* too narrowly, and if the Fifth Circuit's holding means what he contends, the holding contravenes earlier Fifth Circuit precedent. In *Freeman*, the court stated the following regarding an arrest-without-probable-cause claim and one for excessive force: "That the deputies' arrest of Freeman was unlawful on the facts alleged does not, however, mean that any force used by the deputies to effectuate the arrest was necessarily excessive." 483 F.3d at 417. This is so because the excessive force claim must be analyzed "without regard to whether the arrest itself was justified[,]" as the "excessive force claim is separate and distinct from [Freeman's] unlawful arrest claim." *Id.* (citations omitted).[15]

_____

[15] At a minimum, assuming Mr. Mohamed's interpretation of the holding in *Alexander* is correct, the friction between *Alexander* and *Freeman* supports the court's conclusion that the law pertaining to the amount of force that was objectively reasonable under the unique circumstances presented was not clearly established. *See Turner*, 848 F.3d at 685 ("[A]s the Supreme Court has explained, '[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.'") (quoting *Wilson*, 526 U.S. at 618); *see also Brosseau*, 543 U.S. at 198 ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.") (citing *Saucier*, 533 U.S. at 206) (internal punctuation and citations omitted).

In sum, Mr. Mohamed has failed to allege more than a de minimis injury stemming from Sgt. Mitchell's and Sgt. Miller's alleged conduct during his arrest. The alleged injuries of A.M. are certainly no greater than those alleged in *Freeman*, and the Fifth Circuit did not consider them substantial enough to constitute excessive force. In light of the holding in *Freeman*, this court cannot hold that Mr. Mohamed has stated a claim upon which relief can be granted with respect to his excessive force claim. As such, he has not alleged an underlying constitutional violation by Sgt. Miller and Sgt. Mitchell. Accordingly, the court will grant their motion to dismiss the excessive force claims based on qualified immunity.

Alternatively, even if Mr. Mohamed had established that any of the officers used excessive force (and thus performed an unreasonable seizure under the Fourth Amendment), the court would perform an entirely separate inquiry applying a different reasonableness standard. "[T]o evaluate the 'clearly established law' prong of the qualified immunity test, the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the right." *Ontiveros*, 564 F.3d at 383 n.1. As the court noted in *Ontiveros*: "Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *Id.* (quoting *Brosseau*, 543 U.S. at 201); *see also Anderson*, 483 U.S. at 638 ("[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal quotation marks omitted)).

As previously stated, in *Brousseau*, the Supreme Court stated: "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." 543 U.S. at 198 (citing *Saucier*, 533 U.S. at 206) (which held that qualified immunity operates "to protect officers from the

sometimes 'hazy border between excessive and acceptable force'").  "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* at 201.  "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.*  In this case, Mr. Mohamed, other than relying on the general principles set forth in *Graham*, which defines the parameters of excessive force at a high degree of generality, has failed to meet his burden of pointing to then-extant clearly established law that would have apprised reasonable officers in the position of the Officer Defendants that their alleged conduct was clearly unreasonable.

This is not an area of clearly established law, as noted by one district court in considering an allegation of excessive force against a police officer in a school setting:

> If the Fifth Circuit has declined to recognize school children's claims under the Fourth Amendment for school officials' use of restraining techniques, it seems that school children's claims against police officers responding to a school's request for back-up cannot be analyzed in a way that is divorced from the school context. This is particularly so when Fourth Amendment reasonableness analyses are so context-driven. The fact that this Court even has to speculate as to what standard to apply to the police officers' conduct toward a student here in order to determine if their conduct was constitutionally permissible seems determinative of the qualified immunity analysis: clearly established law does not put the constitutionality of the police officers' conduct beyond debate.

*Edmond on Behalf of M.B. v. Lafayette Consol. Gov't*, 2018 WL 344154, at *6 (W.D. La. Jan. 9, 2018) (quoting *Thomas v. City of New Orleans*, 883 F. Supp. 2d 669, 688 (E.D. La. 2012)); *see also Thomas*, 883 F. Supp. 2d at 687 (quoting *Milligan v. City of Slidell*, 226 F.3d 652, 654-655 (5th Cir. 2000) ("But '[t]he [Supreme] Court [has] indicated that although the Fourth Amendment applies in schools, the nature of those rights is what is appropriate for children in school.'")); *Milligan*, 226 F.3d at 655 (quoting *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995) ("The reasonableness

[of a search or seizure] must take into account the schools' 'custodial and tutelary responsibility for children.'")).

On this alternative ground, the court concludes that Mr. Mohamed's excessive force claim fails because then-extant clearly established law would not have apprised reasonable officers in the Officer Defendants' position, that their alleged conduct related to handcuffing A.M. during the arrest (*see* Sec. Am. Compl. ¶ 67) would run afoul of the Fourth Amendment's prohibition on the use of excessive force. Accordingly, the court will grant the Officers Defendants' motion to dismiss based on qualified immunity on this basis as well.

### C. Title VI Claims Against the IISD

In *Mohamed I*, the court granted the IISD's motion to dismiss Mr. Mohamed's Title VI race and religious discrimination claims, dismissing the former without prejudice and the latter with prejudice, as "Title VI does not proscribe discrimination based on religion." *Mohamed I*, 252 F. Supp. 3d at 627.[16] As to the Title VI race discrimination claim premised on Principal Cummings's decision to remove A.M. from class, order him to write a statement, and order a three-day suspension, the court concluded that Mr. Mohamed failed to plead any facts from which the court could reasonably infer that Principal Cummings intentionally discriminated against A.M. or treated him differently from other similarly situated students because of his race. *Id.* at 627-28. The court

---

[16] Section 601 of Title VI provides in relevant part: "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a claim for damages under Title VI, a private litigant must, among other things, "plead facts in support of intentional discrimination." *Price ex rel. Price v. Louisiana Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (per curiam) (citing *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001); *see also Sandoval*, 532 U.S. at 280 ("'Title VI itself directly reach[es] only instances of intentional discrimination.'") (quoting *Alexander v. Choate*, 469 U.S. 287, 293 (1985)). A complaint that does not set forth "specific allegations of acts that were taken with discriminatory intent" does not state a claim for Title VI violations. *Muthukumar v. University of Tex. at Dallas*, 2010 WL 5287530, at *5 (N.D. Tex. Dec. 27, 2010) (Boyle, J.).

stated: "Plaintiff advances only his subjective belief that Principal Cummings's actions were motivated by A.M.'s race. These bare bones allegations do not meet the *Iqbal* standard." *Id.* at 627 (citation omitted). Similarly, the court concluded that the allegations that Ms. West confiscated the device, asked A.M. if it was a bomb, alerted school resource officers about the device, and asked them to inspect the device, were insufficient to state facts from which the court could reasonably infer that she was intentionally discriminating against A.M. based on his race.

In the Second Amended Complaint, in addition to making the same allegations he previously made, Mr. Mohamed includes the new allegation that Principal Cummings ignored IISD procedure by not following a student handbook procedure relating to student questioning by law enforcement. *See* Sec. Am. Compl. ¶¶ 62, 92. As previously stated in the court's analysis of Mr. Mohamed's section 1983 claims against Principal Cummings, *see supra*, a deviation from an entity's internal procedure, without more, does not show discriminatory intent or itself amount to a constitutional violation, as constitutional requirements nevertheless may have been met. *See Davis*, 468 U.S. at 194; *Brown*, 804 F.2d at 335; *Turner*, 476 F.3d at 346.

In *Mohamed I*, the court also determined that dismissal was required because even had the pleadings been sufficient to allege intentional discrimination based on A.M.'s race, a school district cannot be held vicariously liable under Title VI, and there were no well-pleaded facts that an IISD official authorized to take corrective action had actual knowledge of the alleged discrimination and responded with deliberate indifference. *Id.* at 628 (citing *Gesber v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (holding that under Title VI, like Title IX, in cases that do not involve an official policy, damages are not available unless an "appropriate person," an official authorized to take corrective measures, had "actual knowledge" of the discrimination and responded with

"deliberate indifference.")). The court also rejected Mr. Mohamed's attempt to show intentional discrimination through raw disciplinary data that was not tied to the events that transpired on September 14, 2015. *Id.* ("Allegations pertaining to TEA data purportedly showing racial disparity in student discipline and Dr. Hines's report concluding that 'dysconscious racism' was present, do not establish that IISD's leadership knew about intentional discrimination at McArthur or any specific unlawful disciplinary incident or practice."). The court also stated: "Even were the TEA data and Dr. Hines's report interpreted to suggest a shortcoming in the disciplinary process, they are insufficient to demonstrate that the IISD had actual knowledge of, or acted with deliberate indifference to, the intentional discrimination alleged in the Complaint." *Id.*

Other than conclusory allegations, the Second Amended Complaint does not contain factual allegations, or those from which the court can reasonable infer, that Principal Cummings or Ms. West intentionally discriminated against A.M. based on his race or treated him differently than similarly situated students because of his race. Further, even assuming such facts had been sufficiently alleged, other than conclusory allegations, the Second Amended Complaint does not contain sufficient factual allegations from which the court can infer that the IISD had actual knowledge of any such animus or alleged facts that satisfy the requirements of *Gesber*. Finally, Mr. Mohamed continues to rely of the raw disciplinary date and Dr. Hines's report, which the court has previously rejected as a basis to infer intentional discrimination based on race at McArthur.

In sum, for the reasons stated above and those set forth in *Mohamed I*, incorporated herein by reference as if repeated verbatim, the court concludes that Mr. Mohamed has failed to cure the pleading deficiencies pointed out by the court in *Mohamed I* with respect to his Title VI race

discrimination claim against the IISD. Accordingly, the court will grant the IISD's motion to dismiss Mr. Mohamed's Title VI race discrimination claims.

## IV.    Amendment of the Pleadings

### A.    Standard

In response to the Officer Defendants' respective motions to dismiss, Mr. Mohamed did not request to amend his pleadings in the event the court determined that he failed to state claims upon which relief can be granted. In response to the City's, the IISD's, and Principal Cummings's respective motions to dismiss, Mr. Mohamed did request leave to replead in the event the court determined he failed to state claims upon which relief can be granted.

The provision of Rule 15(a)(2) of the Federal Rules of Civil Procedure that states "[t]he court should freely give leave when justice so requires" is not without limitation. The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) (citation omitted). In determining whether to allow an amendment of the pleadings, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted). When a party has amended several times or had the opportunity to amend but did not so, "'[a]t some point a court must decide that a plaintiff has had a fair opportunity to make his case; if after that time, a cause of action has not been established, the court should finally dismiss the

suit.'" *Id.* at 567 (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)). For the reasons that follow, the court determines that Mr. Mohamed has had a fair opportunity to make his case.

**B.      Discussion**

In *Mohamed I*, the court set out in punctilious detail the apposite pleading requirements for Mr. Mohamed to avoid or defeat a Rule 12(b)(6) motion to dismiss filed by governmental entities, and public officials asserting the defense of qualified immunity. *Mohamed I*, 252 F. Supp. 3d at 614-16, 620-22. The court also gave Mr. Mohamed an opportunity to amend his pleadings until June 1, 2017, with respect to those allegations that were determined to be factually deficient. *Id.* at 629. On June 1, 2017, Mr. Mohamed filed Plaintiff's First Amended Original Complaint (Doc. 27), which was his second opportunity to state a claim against the City, the IISD, and Principal Cummings. On June 15, 2017, two weeks after the deadline to amend pleadings had expired, the court granted Mr. Mohamed's motion for leave to file a Second Amended Complaint, which he filed on June 15, 2017. This was his third opportunity to state a claim against the City, the IISD, and Principal Cummings. In the Second Amended Complaint, Mr. Mohamed included the Officer Defendants as parties for the first time and offered the court no explanation as to why they were not named as parties in Plaintiff's Original Complaint, filed August 6, 2016,  or even in Plaintiff's First Amended Original Complaint, filed on June 1, 2017.

In light of the court's careful and specific notice to Mr. Mohamed, in light of him not requesting to further amend his pleadings in response to the Officer Defendants' respective motions to dismiss, in light of the three opportunities he has been give to state a claim against the City, the IISD, and Principal Cummings, and in light of the strong challenges made by Defendants to the Second Amended Complaint, the court determines that Mr. Mohamed has pleaded his best case.

Even though Sergeant Miller and Mitchell's motion to dismiss has been pending since July of last year, and Officers Taylor and Howman's respective motions to dismiss have been pending since September of last year, Mr. Mohamed relied on the strength of his pleadings and did not request leave to amend if the court found the allegations in the Second Amended Complaint to be insufficient. In other words, he is standing by those allegations and telling the court that nothing further needs to be said regarding his claims against the Officer Defendants. By not requesting to replead, he is effectively saying, "I have pleaded or stated my best case against the Officer Defendants." While the court recognizes that the Officer Defendants were not included until the Second Amended Complaint,[17] Mr. Mohamed was duly put on notice in *Mohamed I* of the heightened pleading requirement necessary to defeat or overcome a government official's entitlement to qualified immunity. *Mohamed I*, 252 F. Supp. 3d at 620-22. He was clearly aware of this requirement and failed to allege facts that would overcome or defeat the Officer Defendants' entitlement to qualified immunity.

This case has been pending since August 8, 2016; the court wrote an exhaustive opinion in *Mohamed I*; the parties have thoroughly briefed the issues; and the court concludes that Mr. Mohamed has had ample opportunity to sufficiently plead his case. If the court allows Mr. Mohamed an opportunity to amend his pleadings as to the City, the IISD, and Principal Cummings, it will be his fourth "bite at the apple." As to these Defendants, Mr. Mohamed has had three opportunities to state a claim against them and has failed to do so. The court does not believe a

---

[17] Given the Officer Defendants' involvement as alleged by Mr. Mohamed, the court fails to understand why they were neither included in Plaintiff's Original Complaint, which was filed August 8, 2016, nor included in Plaintiff's First Amended Original Complaint, filed June 1, 2017. The Officer Defendants were not added as parties until the Second Amended Complaint, filed on June 15, 2017, two weeks after the deadline to amend pleadings had expired.

fourth attempt is warranted under these circumstances. As Mr. Mohamed has failed to cure the pleading deficiencies to state a claim against the City, the IISD, and Principal Cummings, and has effectively acknowledged that he has stated his best case against the Officer Defendants, the court concludes that further amendment is not warranted, as it is futile and will unduly and unnecessarily delay the resolution of this action.

## V.      Conclusion

For the reasons herein stated, the court **grants** Defendant City of Irving's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 35); **grants** Defendant Irving Independent School District's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 38); **grants** Defendant Daniel Cummings's Motion to Dismiss Plaintiffs' Second Amended Complaint  (Doc. 39); **grants** Defendants Miller's and Mitchell's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 42); **grants** Defendant Taylor's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 49); and **grants** Defendant Howman's Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 52).

The court **dismisses with prejudice** the following claims pursuant to Federal Rule of Civil Procedure 12(6)(6): Mr. Mohamed's section 1983 claims against the IISD and Principal Cummings for alleged violations of A.M.'s right to equal protection under the Fourteenth Amendment; Mr. Mohamed's Title VI claim against the IISD insofar as it is based on racial discrimination; Mr. Mohamed's section 1983 claim against the City; and Mr. Mohamed's section 1983 claims against Officer Howman, Officer Taylor, Sgt. Miller, and Sgt. Mitchell, as they are entitled to qualified immunity. The court also **dismisses with prejudice** Mr. Mohamed's claim for joint and several liability, as he has not offered any allegations addressing the elements of such a claim.

As no claims remain in this action, judgment will issue by separate document as required by Federal Rule of Civil Procedure 58(a).

It is so **ordered** this **13th day** of **March, 2018.**

Sam A. Lindsay
United States District Judge